UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SHANIQUE ROSEANNE NICOLE PEREZ,<br><br>Defendant, Counterclaim Plaintiff, And Crossclaim Plaintiff<br><br>V.<br><br>MASSACHUSETTS BAY INSURANCE COMPANY,<br><br>Counterclaim Defendant<br><br>and<br><br>KIPP DC SUPPORTING CORPORATION d/b/a KIPP DC- SHAW QALICB, INC. , d/b/a KIPP DC- DOUGLAS QALICB<br>Crossclaim-Defendants. | * * * * * * * * * * * * * * * * * * | Civil Action No. 1:24-cv-03135-ACR |

NOTICE OF FILING

Defendant, Counterclaim Plaintiff, and Crossclaim Plaintiff Shanique Roseanne Nicole Perez, proceeding pro se, respectfully gives notice of the filing of her **Amended Counterclaim and Crossclaim for Declaratory, Equitable, and Monetary Relief**, filed as a matter of course pursuant to Federal Rule of Civil Procedure 15(a)(1).

Respectfully submitted,

_______________________________________________

/s/ SHANIQUE ROSEANNE NICOLE PEREZ (She, Her, Hers)
Defendant / Counterclaim Plaintiff / Crossclaim Plaintiff
Pro Se
8/30/2026

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SHANIQUE ROSEANNE NICOLE PEREZ,<br><br>Defendant, Counterclaim Plaintiff, And Crossclaim Plaintiff<br><br>V.<br><br>MASSACHUSETTS BAY INSURANCE COMPANY,<br><br>Counterclaim Defendant<br><br>and<br><br>KIPP DC SUPPORTING CORPORATION d/b/a KIPP DC- SHAW QALICB, INC. , d/b/a KIPP DC- DOUGLAS QALICB<br>Crossclaim-Defendants. | * * * * * * * * * * * * * * * * * * * | Civil Action No. 1:24-cv-03135-ACR |

**AMENDED COUNTERCLAIM AND CROSSCLAIM FOR DECLARATORY, EQUITABLE, AND MONETARY RELIEF**

**Complaint for Declaratory, Equitable, and Monetary Relief Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202; Fed. R. Civ. P. 13, 15, and 57; District of Columbia common law governing fraud, civil conspiracy, and secondary liability; and equitable tolling based upon fraudulent concealment.**

Defendant and Counterclaim Plaintiff SHANIQUE ROSEANNE NICOLE PEREZ ("Perez"), appearing pro se, brings this Amended Counterclaim against Plaintiff and Counterclaim Defendant Massachusetts Bay Insurance Company ("MBIC") and crossclaims against Co-Defendant KIPP DC Supporting Corporation ("KIPP DC"), and alleges as follows:

This action arises from an insurance coverage dispute initiated during the pendency of Perez v. KIPP DC, Civil Action No. 1:21-cv-00929-RC, and from conduct concerning the procurement, interpretation, administration, disclosure, and litigation of insurance coverage that bears directly

upon the claims asserted in the underlying litigation.

Perez seeks declaratory, equitable, and monetary relief arising from disputed issues concerning the policies and coverage potentially applicable to her claims; actual and prior notice; claims handling and underwriting; reservation-of-rights determinations; insurance and institutional communications; disclosure of potentially responsive insurance; and alleged tortious conduct occurring before and during this declaratory judgment action.

Discovery undertaken following the Court's May 28, 2026 hearing, together with publicly available records, deposition testimony, audited financial statements, insurance materials, governmental and institutional records, and the procedural history of this action and the underlying litigation, disclosed additional facts material to the claims asserted herein.

Among other things, those facts raise material issues concerning:

(a) whether MBIC possessed standing to invoke this Court's jurisdiction when it commenced this declaratory judgment action;

(b) which insurance policy or policies and coverage parts potentially apply to the claims asserted in the underlying litigation, including whether the policy principally identified by MBIC constitutes the complete universe of potentially applicable coverage;

(c) whether additional insurance policies, coverage parts, policy periods, retroactive dates, prior notice, claims, or occurrences affect the existence, availability, priority, or scope of coverage;

(d) what information MBIC and KIPP DC possessed concerning policy applicability, historical notice, institutional knowledge, claims handling, underwriting, coverage, and reservation-of-rights determinations, and whether material information concerning those subjects was misrepresented, omitted, concealed, or withheld;

(e) whether KIPP DC engaged in fraudulent misrepresentation, willful omission, or fraudulent concealment concerning matters material to Perez's claims and legal rights, and whether MBIC, after acquiring knowledge of the relevant circumstances, knowingly provided substantial assistance to or acted in concert with KIPP DC in furtherance of that conduct; and

(f) the parties' respective rights and legal interests arising from the insurance controversy MBIC placed before this Court.

The underlying litigation supplies the factual and procedural predicate for the claims asserted here, but the rights and liabilities presented by this pleading are independently grounded in the insurance controversy and in the alleged conduct concerning insurance procurement, disclosure, administration, claims handling, coverage, and litigation. The underlying events are therefore alleged to the extent they establish notice, knowledge, materiality, intent, policy applicability, causation, concerted conduct, and resulting injury. Perez seeks adjudication of the distinct legal rights and liabilities arising from that conduct and from the insurance controversy MBIC itself placed before this Court.

## THE PARTIES

1. Counterclaim Plaintiff Shanique Roseanne Nicole Perez ("Perez") is an adult resident of Maryland. Perez was named by Massachusetts Bay Insurance Company ("MBIC") as a Co-Defendant in this declaratory judgment action because she is the plaintiff and underlying claimant in Perez v. KIPP DC, et al., No. 1:21-cv-00929-RC (D.D.C.).

2. In the procedural posture of this Amended Counterclaim, Perez proceeds as Counterclaim Plaintiff against original Plaintiff MBIC and asserts crossclaims, as applicable, against her original Co-Defendant KIPP DC. Accordingly, KIPP DC is referred to herein, where appropriate, as "Cross-Defendant KIPP DC."

3. Perez has a direct and substantial interest in the insurance controversy because MBIC itself invoked this Court's jurisdiction, named Perez as a Defendant, and seeks declarations determining the existence, scope, and availability of insurance coverage for liabilities arising from claims asserted by Perez against KIPP DC in the underlying litigation.

4. Counterclaim Defendant Massachusetts Bay Insurance Company ("MBIC") was the original Plaintiff in this declaratory judgment action and is an insurance company that issued insurance coverage to KIPP DC.

5. MBIC issued the 2017–2018 insurance policy principally identified in this declaratory judgment action and issued a Reservation of Rights concerning coverage on July 5, 2018.

6. MBIC undertook and funded KIPP DC's defense in litigation concerning Perez's claims, including proceedings before the United States District Court for the District of Columbia and KIPP DC's defense during the subsequent appeal before the United States Court of Appeals for the District of Columbia Circuit.

7. MBIC thereafter commenced this declaratory judgment action against Perez and KIPP DC and requested judicial declarations concerning MBIC's rights and obligations under insurance coverage issued to KIPP DC.

8. Upon information and belief, MBIC possesses or controls policy, underwriting, claims-handling, coverage, reservation-of-rights, and communications records material to determining the nature, scope, administration, and history of insurance coverage implicated by Perez's claims and the rights and legal interests of the parties to this action.

9. Cross-Defendant KIPP DC Public Charter Schools ("KIPP DC") was named by MBIC as a Co-Defendant in this declaratory judgment action and is a defendant in the Underlying Litigation.

10. KIPP DC employed Alan Coleman during a portion of the period relevant to Perez's underlying claims.

11. KIPP DC possesses or controls institutional, insurance, reporting, investigative, vendor, and communications records potentially material to the claims and defenses asserted in this action.

12. For purposes of this pleading, MBIC is referred to as "Counterclaim Defendant MBIC," and KIPP DC is referred to as "Cross-Defendant KIPP DC," reflecting their respective procedural relationships to Counterclaim Plaintiff Perez.

13. Crossclaim Defendant KIPP DC Supporting Corporation d/b/a KIPP DC–Shaw QALICB, Inc., d/b/a KIPP DC–Douglas QALICB ("KIPP DC Supporting Corporation") is a Co-Defendant named by MBIC in this declaratory judgment action and is also a defendant in the Underlying Litigation.

14. Crossclaim Defendant KIPP DC Public Charter Schools ("KIPP DC Public Charter Schools") is a Co-Defendant named by MBIC in this declaratory judgment action and is also a defendant in the Underlying Litigation.

15. MBIC alleges that KIPP DC Supporting Corporation and KIPP DC Public Charter Schools were provided coverage under MBIC's 2017–2018 Primary Policy and Excess and Umbrella Policy and defines those entities collectively as "KIPP DC."

16. Perez uses "KIPP DC" as a collective designation herein where the allegations concern both entities or where the presently available record does not distinguish between them.

Where the alleged conduct is attributable to a particular KIPP entity, Perez identifies that entity separately.

## JURISDICTION AND VENUE

17. This Court has subject-matter jurisdiction over MBIC's declaratory judgment action pursuant to 28 U.S.C. § 1332. In commencing this action, MBIC alleged complete diversity among the parties and an amount in controversy exceeding $75,000, exclusive of interest and costs. MBIC seeks declaratory relief pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, concerning an actual controversy within this Court's diversity jurisdiction.

18. MBIC affirmatively named Perez, KIPP DC Supporting Corporation, and KIPP DC Public Charter Schools as Defendants and invoked this Court's jurisdiction to obtain judicial declarations concerning insurance coverage for liabilities arising from claims asserted by Perez against the KIPP DC entities in the Underlying Litigation.

19. An actual and concrete controversy exists among MBIC, Perez, KIPP DC Supporting Corporation, and KIPP DC Public Charter Schools concerning the existence, applicability, scope, and availability of insurance coverage and the parties' respective rights and legal interests in the coverage controversy MBIC placed before this Court.

20. Perez asserts counterclaims against MBIC pursuant to Federal Rule of Civil Procedure 13 and seeks affirmative declaratory relief concerning the actual controversy before the Court pursuant to 28 U.S.C. §§ 2201–2202 and Federal Rule of Civil Procedure 57.

21. Perez asserts crossclaims against Co-Defendants KIPP DC Supporting Corporation and KIPP DC Public Charter Schools pursuant to Federal Rule of Civil Procedure 13(g). Those crossclaims arise from transactions and occurrences that form the subject matter of MBIC's original action, including the insurance relationships, coverage disputes, communications, representations, omissions, and underlying liabilities upon which the coverage controversy depends.

22. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over Perez's District of Columbia common-law claims because those claims are so related to the claims within the Court's original jurisdiction that they form part of the same case or controversy under Article III.

23. Specifically, Perez's claims for fraudulent misrepresentation and willful omission, fraudulent concealment, civil conspiracy, aiding and abetting, and related declaratory and equitable relief arise from or materially concern the same insurance relationships, policies and coverage parts, notice, institutional knowledge, underwriting, claims handling, coverage positions, communications, underlying liabilities, and alleged course of conduct placed in controversy by MBIC when it commenced this declaratory judgment action.

24. Perez has Article III standing to seek the relief asserted herein because MBIC seeks judicial declarations determining insurance coverage potentially available for liabilities arising from Perez's claims; Perez alleges concrete injuries arising from the independent tortious conduct pleaded herein; and the declaratory, equitable, and monetary relief requested would redress those alleged injuries and determine legal interests presently placed in controversy before this Court.

25. The claims asserted herein concern the actual insurance controversy before this Court and alleged conduct arising from or materially related to that controversy. The Underlying Litigation supplies factual and procedural predicates material to notice, knowledge, policy applicability, coverage, materiality, causation, and the alleged tortious conduct, while the claims asserted herein seek adjudication of distinct rights and liabilities arising from the insurance controversy and related conduct.

26. Venue is proper in the United States District Court for the District of Columbia pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to the claims occurred in the District of Columbia, the KIPP DC entities operate in the District, the Underlying Litigation is pending in this District, and MBIC selected this District when it commenced this action.

## FACTUAL ALLEGATIONS

### Introduction And Background

27. This action arises from an insurance coverage dispute initiated by Massachusetts Bay Insurance Company ("MBIC") concerning its obligations to defend and indemnify KIPP DC Supporting Corporation and KIPP DC Public Charter Schools (collectively "KIPP DC") with respect to claims asserted by Counterclaim Plaintiff Shanique Roseanne Nicole Perez ("Perez").

28. The insurance controversy presently before this Court did not arise in a factual vacuum. The conduct underlying Perez's claims began while Perez was a minor and substantially

predates the 2017–2018 MBIC Primary Policy and Excess and Umbrella Policy principally relied upon in this declaratory judgment action.

29. Beginning in approximately 2004, when Perez was fourteen years old and a student at KIPP DC, Perez was sexually abused by Alan Wade Coleman, then an adult teacher employed by KIPP DC.

30. The conduct continued after Coleman left KIPP DC and obtained employment at another District of Columbia public charter school. Perez alleges that the abusive relationship continued for approximately five years and ultimately involved her removal from her family home and transportation across jurisdictional boundaries.

31. In April 2016, Perez reported Coleman's conduct to the Metropolitan Police Department ("MPD"), resulting in a criminal investigation.

32. On or about May 10, 2016, Coleman was arrested in Gainesville, Florida, in connection with the investigation.

33. The criminal investigation resulted in prosecutions in the District of Columbia and Montgomery County, Maryland.

34. In 2017, Coleman entered plea agreements arising from portions of the conduct investigated. In the District of Columbia, Coleman pleaded guilty to first-degree child sexual abuse. Coleman separately pleaded guilty in Montgomery County, Maryland.

35. The United States Attorney's Office publicly described the government's evidence as establishing that Coleman engaged in sexual acts with Perez when she was fourteen and fifteen years old, transported her from the District of Columbia into Maryland, and remained in a relationship with her until she was nineteen.

36. Perez alleges that the conduct investigated was materially broader than the conduct ultimately encompassed by the offenses of conviction, including allegations of prolonged removal from her family home and interstate and international transportation while she was a minor.

37. The criminal investigation and resulting prosecutions are material to the present insurance controversy because they preceded or overlapped with material events concerning KIPP DC's insurance relationship, civil litigation arising from Perez's abuse, and MBIC's subsequent coverage positions.

38. During the period following commencement of the criminal investigation, MBIC issued KIPP DC two policies for the July 1, 2017 through July 1, 2018 policy period: Primary Policy No. ZD3 D303270 00 and Excess and Umbrella Policy No. UH3 D303271 00. MBIC now principally places those policies at issue in this declaratory judgment action.

39. On February 2, 2018, Perez, proceeding under a pseudonym, commenced Doe v. KIPP DC Supporting Corporation, et al., Civil Action No. 1:18-cv-00260-RC, in the United States District Court for the District of Columbia.

40. Doe asserted civil claims arising from the sexual abuse Perez experienced as a minor and the alleged acts and omissions of KIPP DC, Capital City Public Charter School, Coleman, and other defendants.

41. By the commencement of Doe, allegations concerning Coleman's conduct had therefore resulted in both criminal proceedings and civil litigation involving KIPP DC.

42. In July 2018, MBIC issued KIPP DC a Reservation of Rights concerning insurance coverage.

43. On January 3, 2019, Judge Rudolph Contreras district court dismissed Doe on statute-of-limitations grounds. The dismissal was without prejudice.

44. Several months later, the District of Columbia enacted the Sexual Abuse Statute of Limitations Amendment Act of 2018, which materially changed the limitations framework applicable to civil claims arising from childhood sexual abuse and created a revival period for certain previously time-barred claims.

45. The statutory amendment materially altered the legal landscape governing Perez's ability to seek civil relief arising from the abuse she experienced as a minor.

46. Against this backdrop—criminal investigation and prosecution, the 2017–2018 MBIC policy, the commencement of Doe, MBIC's Reservation of Rights, dismissal of Doe, and the District of Columbia's subsequent statutory amendment—Perez commenced the litigation that ultimately gave rise to the coverage dispute presently before this Court.

47. The chronology is material to Perez's Counterclaim because the parties' respective knowledge, notice, insurance relationships, coverage positions, and subsequent conduct must be evaluated against what had occurred and what information existed at the relevant times.

48. Perez does not allege merely from the chronology that MBIC possessed any particular information before it actually received that information. Rather, the timing of these events makes material the factual questions of what KIPP DC and MBIC respectively knew, when each acquired that knowledge, what information was communicated between them, and how that information affected underwriting, coverage, claims handling, defense, and subsequent disclosure obligations.

**The Underlying Litigation**

49. On January 3, 2019, Judge Rudolph Contreras of this Court dismissed Doe v. KIPP DC, the predecessor civil action arising from Perez's abuse, on statute-of-limitations grounds.

50. Thereafter, the District of Columbia amended the statute of limitations applicable to civil claims arising out of sexual abuse, materially changing the limitations framework applicable to Perez's claims. MBIC itself acknowledges this statutory amendment in its Complaint for Declaratory Judgment.

51. On April 6, 2021, following that statutory amendment, Perez commenced Shanique Perez v. KIPP DC Supporting Corporation, et al., Civil Action No. 1:21-cv-00929-RC, in the United States District Court for the District of Columbia (the "Underlying Litigation").

52. The original complaint asserted claims against KIPP DC including Title IX, negligent supervision and hiring/retention, negligence, premises liability, intentional infliction of emotional distress, and negligent infliction of emotional distress.

53. MBIC undertook the defense of the KIPP DC entities in the Underlying Litigation. MBIC admits that it defended KIPP DC against Perez's Title IX claim while denying coverage for the remaining causes of action.

54. In February 2022, the district court dismissed Perez's action on res judicata grounds based upon the prior Doe litigation.

55. Perez appealed that judgment to the United States Court of Appeals for the District of Columbia Circuit.

56. MBIC continued funding KIPP DC's defense during the appeal, thereby participating in KIPP DC's defense of the Underlying Litigation through both district-court and appellate proceedings.

57. On June 13, 2023, the D.C. Circuit reversed the judgment dismissing Perez's action and remanded the matter for further proceedings.

58. Following remand, the parties proceeded with substantial factual discovery concerning, among other things, KIPP DC's knowledge of Coleman's relationship with Perez, reports and warnings made to KIPP DC personnel, KIPP DC's institutional response, and the circumstances surrounding Coleman's employment and departure from KIPP DC.

59. Perez also made numerous discovery requests in the Underlying Litigation, including requests bearing upon KIPP DC's insurance coverage, historical knowledge, notice, and institutional response.

60. KIPP DC has maintained that discovery in the Underlying Litigation is now closed.

61. The closure of discovery in the Underlying Litigation is significant to the present controversy because MBIC subsequently invoked a separate federal proceeding to obtain affirmative relief concerning insurance coverage.

62. On July 25, 2024, the district court dismissed Perez's Title IX claim against KIPP DC. Perez thereafter filed her First Amended Complaint on July 31, 2024.

63. MBIC alleges that, following dismissal of the Title IX claim, the remaining claims against KIPP DC consist of gross negligence; grossly negligent hiring, supervision, and retention; premises liability; and intentional infliction of emotional distress.

64. On August 8, 2024, MBIC advised KIPP DC that it considered coverage unavailable following dismissal of the Title IX claim.

65. On November 5, 2024, MBIC commenced this Declaratory Judgment Action against KIPP DC Supporting Corporation, KIPP DC Public Charter Schools, and Perez.

66. MBIC alleges that it issued KIPP DC two policies for the July 1, 2017 through July 1, 2018 policy period: Policy No. ZD3 D303270 00, which MBIC identifies as the "Primary Policy," and Policy No. UH3 D303271 00, which MBIC identifies as the "Excess and Umbrella Policy."

67. MBIC seeks declarations that neither policy obligates it to continue defending or indemnifying KIPP DC in connection with the Underlying Litigation.

68. MBIC's Complaint relies principally upon the absence of an "educators wrongful act," the Bodily Injury Exclusion, the Abuse and Molestation Exclusion, the Prior and Pending Proceedings Exclusion, and provisions of the Excess and Umbrella Policy.

69. Significantly, MBIC's Complaint expressly alleges that the Abuse and Molestation Exclusion encompasses claims arising from negligent employment, investigation, supervision, reporting to proper authorities or failure to report, and retention of a person for whom the insured was legally responsible.

70. MBIC further alleges, as a separate basis for denying coverage, that criminal proceedings against Coleman began before the July 1, 2017 inception date of the Policies. Specifically, MBIC alleges that Coleman was charged with First Degree Child Sex Abuse in the District of Columbia on July 29, 2016 and was indicted in Maryland on October 20, 2016.

71. Thus, MBIC's own Complaint places events predating the 2017–2018 policy period directly at issue in its requested coverage determination.

72. MBIC nevertheless asks this Court to determine its obligations to KIPP DC by reference to policies issued for the July 1, 2017 through July 1, 2018 policy period, while the conduct underlying Perez's claims allegedly occurred principally between 2004 and 2009 and that MBIC itself relies upon proceedings beginning in 2016.

73. MBIC further seeks recoupment from KIPP DC of defense costs allegedly paid for uncovered claims.

74. By commencing this action and requesting affirmative declarations concerning its defense and indemnification obligations, MBIC placed the existence, scope, operation, and application of the insurance coverage upon which it relies directly before this Court.

75. Perez alleges that the resulting controversy necessarily raises factual questions concerning what insurance policies and coverage parts covered or potentially covered KIPP DC during relevant periods; what information KIPP DC supplied to its insurers; what MBIC knew concerning the underlying allegations and criminal proceedings; when MBIC acquired that knowledge; what coverage and defense decisions followed; and whether material coverage information was disclosed to Perez in either the Underlying Litigation or this action.

**MBIC's Insurance Relationship with KIPP DC and coverage of the Underlying Claims**

76. MBIC alleges that it issued two insurance policies to the KIPP entities for the policy period July 1, 2017 through July 1, 2018.

77. The first, Policy No. ZD3 D303270 00 (the "Primary Policy"), includes School and Educators Legal Liability coverage. The second, Policy No. UH3 D303271 00 (the "Excess and Umbrella Policy"), provides excess and umbrella coverage for the same policy period.

78. MBIC alleges that the Primary Policy provides up to $1 million in liability coverage for an "educators wrongful act," subject to the terms, conditions, definitions, exclusions, and endorsements contained in the Policy.

79. MBIC further acknowledges that payment of defense expenses under the pertinent coverage does not reduce the Primary Policy's applicable liability limit.

80. The insurance relationship between MBIC and KIPP DC became directly implicated by litigation arising from Perez's allegations no later than 2018.

81. When Perez commenced Doe v. KIPP in 2018, the complaint asserted both federal civil-rights claims and common-law claims arising from the sexual abuse Perez experienced as a minor and the alleged conduct of KIPP DC and other defendants.

82. In connection with Doe, MBIC issued KIPP DC a reservation-of-rights letter dated July 6, 2018.

83. MBIC agreed to defend KIPP DC against certain claims while reserving its position that other claims or categories of liability were excluded from coverage.

84. Among the provisions invoked by MBIC was an Abuse and Molestation Exclusion contained within the Primary Policy.

85. As MBIC presently interprets that exclusion, the Primary Policy broadly excludes liability arising from actual or alleged abuse or molestation, including certain claims arising from negligent employment, investigation, supervision, reporting or failure to report, and retention, subject to an exception relevant to specified "civil rights claims."

86. MBIC contends that a claim seeking loss for discrimination resulting in a violation of Title IX or similar federal or state law may constitute such a "civil rights claim" and thereby fall outside the operation of the Abuse and Molestation Exclusion, subject to the remaining terms of the Policy.

87. MBIC also relies upon a Bodily Injury Exclusion and a Prior and Pending Proceedings Exclusion as additional grounds for its present position that coverage is unavailable.

88. The Prior and Pending Proceedings Exclusion is particularly relevant to the chronology alleged herein because MBIC relies upon criminal proceedings concerning Coleman that commenced before the July 1, 2017 inception of the policies.

89. MBIC specifically alleges that Coleman was charged with First Degree Child Sex Abuse in the District of Columbia on July 29, 2016 and was subsequently indicted in Maryland on October 20, 2016.

90. MBIC therefore affirmatively relies upon events predating the inception of the 2017–2018 Policies as a basis for denying coverage under those Policies.

91. Following the commencement of Perez v. KIPP in April 2021, MBIC again undertook the defense of the KIPP entities because Perez's complaint included a Title IX claim that MBIC considered potentially covered under the Primary Policy.

92. MBIC continued funding KIPP DC's defense through the initial district-court proceedings, the dismissal of Perez's action on res judicata grounds, Perez's appeal, and the subsequent reversal and remand by the D.C. Circuit.

93. MBIC therefore possessed an ongoing insurer-insured relationship with KIPP DC concerning Perez's claims over a period extending substantially beyond the single 2017–2018 policy period identified in its Complaint.

94. Following dismissal of Perez's Title IX claim in July 2024 and the filing of Perez's First Amended Complaint, MBIC concluded that the remaining claims no longer presented a potentially covered "civil rights claim" under its interpretation of the Primary Policy.

95. MBIC thereafter withdrew from KIPP DC's defense.

96. KIPP DC disputes MBIC's right to terminate that defense and maintains that MBIC continues to owe it a duty to defend.

97. Among other things, KIPP DC contends that the dismissal of Perez's Title IX claim remains capable of appellate review and that the possibility of reinstatement of that claim preserves a potential for covered liability.

98. MBIC rejects KIPP DC's position and maintains that neither the possibility of future appellate reinstatement nor allegations contained in superseded pleadings create a present duty to defend.

99. The parties further dispute whether the language of the Primary Policy permitted MBIC to terminate an already-undertaken defense under the circumstances presented here.

100. MBIC has acknowledged in its briefing that a different insurer presently continues to defend KIPP DC in the Underlying Litigation and that the other insurer provides coverage for sexual-misconduct liability.

101. The existence of that separate coverage is material to understanding the complete insurance structure applicable to the claims arising from Perez's abuse, including the respective policies, policy periods, layers of coverage, defense obligations, notice provided to each insurer, and allocation of defense and indemnity obligations.

102. MBIC has itself relied upon the existence of the other insurer's continuing defense in arguing that KIPP DC cannot establish damages arising from MBIC's withdrawal.

103. At the same time, MBIC seeks recoupment from KIPP DC of certain defense expenses MBIC contends it paid in connection with claims that were not covered.

104. Thus, the present controversy encompasses not merely the interpretation of an isolated exclusion, but the history and operation of insurance coverage under which KIPP DC was defended against Perez's claims over multiple years.

105. MBIC's Complaint identifies the Primary Policy and Excess and Umbrella Policy for the 2017–2018 policy period as the MBIC policies upon which it seeks declaratory relief.

106. Perez presently lacks information sufficient to determine whether MBIC, The Hanover Insurance Group, or any affiliated insurer issued KIPP DC additional policies preceding, succeeding, renewing, replacing, supplementing, or otherwise relating to the 2017–2018 Policies.

107. Perez therefore does not presently allege as an established fact that additional MBIC or Hanover policies exist.

108. Perez does allege, however, that the existence or nonexistence of such coverage is a material subject of factual development because MBIC itself relies upon events occurring

before the inception of the 2017–2018 Policies while seeking a declaration concerning liability arising from conduct alleged to have begun many years earlier.

109. The complete insurance relationship is further material because the present record establishes the existence of at least one separate insurer providing sexual-misconduct coverage and continuing KIPP DC's defense after MBIC withdrew.

110. The complete insurance relationship material to the present controversy encompasses, as applicable, policies and renewals; coverage parts and endorsements; applications and underwriting materials; loss histories; notices of claims or circumstances; reservation-of-rights communications; communications among KIPP DC, its brokers and insurers; defense and indemnity arrangements; allocation among insurers; and records sufficient to identify the coverage available during periods material to Perez's claims.

111. These matters bear directly upon the coverage controversy MBIC affirmatively placed before this Court and upon Perez's allegations concerning whether material insurance and coverage information was completely and accurately disclosed.

**Nexus to Security Expenditures, MPD Officer Payments, and Affiliated Vendor Relationships**

112. KIPP DC's relationship to the security-procurement structure alleged herein is independently documented in contemporaneous materials published by Community Purchasing Alliance ("CPA"). In materials concerning its security procurement activities, CPA identified KIPP DC among the District of Columbia charter schools participating in a coordinated procurement process for security services.

113. CPA subsequently publicly documented its role in developing the business of LGC Security. CPA stated that it met LGC founder Traveon Smith in approximately 2015, learned about his security company, and introduced LGC to CPA's network of charter schools, after which LGC's business substantially expanded.

114. In November 2018, CPA published materials and a video concerning LGC Security's growth and CPA's role in facilitating that growth. Those materials described CPA's function as connecting LGC to institutional customers within CPA's charter-school network.

115. Additional public materials concerning CPA's cooperative-purchasing model specifically identify KIPP DC in connection with the development of security-vendor relationships. Those materials describe a security company that had sought access to KIPP DC and explain how CPA's cooperative procurement structure provided security vendors opportunities to establish relationships with participating charter schools.

116. These contemporaneous materials establish substantially more than the coincidental appearance of KIPP DC, CPA, and LGC in unrelated records. They establish that KIPP DC participated in CPA's organized security-procurement activities; that CPA affirmatively facilitated relationships between security vendors and participating charter schools; and that LGC was among the security businesses whose growth CPA attributed to opportunities created through that institutional network.

117. CPA's operating model pooled the purchasing power of participating schools and other institutions to procure and administer operational services, including security. Accordingly, the security relationships alleged herein operated through an organized procurement structure rather than exclusively through isolated purchases from unrelated vendors.

118. Perez's review of KIPP DC's financial and public-charter-school records further identified approximately $9.5 million in security-related expenditures during fiscal years 2018 through 2022. That expenditure period overlapped with Perez's continuing efforts to report the alleged trafficking conduct to law enforcement. Between approximately July and September 2022, after being referred by MPD Commander Daniel Godin, then responsible for the Youth and Family Services Division, Perez twice appeared in person at MPD's trafficking unit and met with Officer Jeremiah Johnson.

119. At the August 5, 2026 hearing in this action, The Honorable Judge Ana C. Reyes questioned counsel for KIPP DC concerning the approximately $9.5 million expenditure figure identified by Perez. In responding to the Court's inquiry, KIPP DC's insurance counsel, Kate Margolis, characterized the expenditures as security and/or risk-management spending.

120. During the same period, KIPP DC was confronting additional sexual-abuse reporting and institutional-risk issues, including the 2018 Andhra Lutz matter. KIPP DC's records reflect approximately $9.5 million in expenditures from FY 2018 through FY 2022 that its insurance counsel, Kate Margolis, characterizes at the August 5, 2026 hearing as security and risk-management spending, including approximately $4.8 million during FY 2019-2020 alone. The timing and concentration of those expenditures, alongside KIPP DC's contemporaneous handling of sexual-abuse reporting matters, are relevant to Perez's allegations concerning KIPP DC's institutional response to known risk and alleged continuing concealment.

121. The expenditure period therefore overlapped with multiple events material to Perez's allegations, including governmental investigations, including governmental investigation of institutional reporting failures, OAG's consideration of charges against institutional officials, Perez's continuing law-enforcement reports concerning Coleman and alleged trafficking, the commencement of Perez v. KIPP in 2021, and Perez's 2022 in-person reports to MPD's trafficking unit.

122. Perez alleges that the relevant financial records identify security-related expenditures that included services performed by off-duty or other MPD officers.

123. The records presently available to Perez, however, do not identify the individual MPD officers associated with certain security-related payments.

124. Perez further alleges that applicable public-charter-school financial reporting requirements required greater specificity concerning vendor expenditures of this nature than appears in the records presently available to her.

125. The absence of officer-level identification is material because it prevents Perez from determining whether any MPD officers receiving compensation through security arrangements funded by KIPP DC also participated in, supervised, received information concerning, communicated about, or otherwise had involvement with Perez's reports concerning Coleman, the investigation of institutional reporting failures, or subsequent law-enforcement interactions involving Perez

126. Perez does not allege that legitimate security expenditures or compensation of off-duty MPD officers, standing alone, establishes wrongdoing or participation in the alleged concealment. Rather, the presently unidentified recipients of those payments and the temporal overlap described above present a factual question as to whether any recipient also participated in, received information concerning, or exercised responsibility over matters involving Perez, Coleman, or the relevant investigations.

127. The material evidentiary inquiry is therefore: who authorized the expenditures; through what entity or entities the payments traveled; which vendors received the funds; which individual MPD officers or other security personnel ultimately received compensation; what services those persons performed; where and when they performed those services; what governmental responsibilities those officers simultaneously held; what information those persons possessed concerning Perez, Coleman, KIPP DC, or the relevant investigations; and whether communications or conduct connect any such financial relationship to the alleged concealment or governmental conduct alleged herein.

128. Perez alleges that this inquiry is particularly material because approximately $9.5 million in identified security-related expenditures extended across multiple fiscal years during which governmental and civil proceedings concerning substantially the same underlying circumstances were occurring.

129. Perez therefore seeks factual development concerning the underlying security contracts; invoices; payment and accounting records; individual officer identities; authorizations; assignments and work records; procurement documents; communications among KIPP DC, CPA, LGC, MPD, and other participating entities; and records identifying the particular MPD personnel for whom security-related expenditures were made.

130. Perez has separately identified references to Clay Consulting LLC in records under review but does not presently possess sufficient evidence concerning that entity's services, personnel, relationship to KIPP DC, or connection, if any, to the conduct alleged herein to characterize its role further.

131. Perez therefore does not presently rely upon Clay Consulting LLC as evidence of participation in the alleged conduct and alleges its existence only to the extent supported by the presently available records pending factual development concerning the services provided and whether those services bear any relationship to the allegations in this Counterclaim.

**Alleged Concealment of Material Information and Resulting Information Asymmetry**

132. Perez alleges that the concealment at issue extends substantially beyond insurance coverage. The insurance-disclosure history described above forms part of a broader alleged course of conduct through which material facts concerning KIPP DC's knowledge of and response to Coleman; prior complaints and warnings concerning Coleman; Perez's alleged kidnapping, abuse, and removal from parental custody; KIPP DC's communications with law-enforcement and governmental authorities; the scope and substance of the subsequent criminal investigation; information provided to, withheld from, or otherwise communicated in connection with that investigation; and records capable of establishing the extent and timing of KIPP DC's institutional knowledge were withheld, incompletely disclosed, materially narrowed, or revealed only after substantial delay.

133. The disclosure issues described above did not arise in isolation. Perez alleges that they occurred against a longer history in which information concerning Coleman's conduct, KIPP DC's knowledge of that conduct, the institutional response to reports concerning Coleman, and the resulting potential liability was repeatedly disclosed only in part, materially narrowed, or discovered by Perez substantially later.

134. Beginning while Perez was a minor, KIPP DC received information concerning the nature of Coleman's relationship with Perez. Perez alleges that students, parents, and other individuals communicated concerns to KIPP DC personnel concerning Coleman's interactions with Perez and that KIPP DC personnel possessed information concerning those concerns before the matter became the subject of later civil litigation.

135. Perez further alleges that, in 2007, her mother directly reported to KIPP DC that her minor daughter was living with Coleman and sought institutional intervention. The precise content, internal dissemination, documentation, and subsequent treatment of that report are material to determining the extent of KIPP DC's historical knowledge.

136. In April 2016, Perez reported Coleman's conduct to the Metropolitan Police Department. Coleman was thereafter arrested in Florida in May 2016, and criminal proceedings subsequently occurred in the District of Columbia and Maryland.

137. Perez alleges that the information communicated during the criminal investigation extended beyond isolated allegations of sexual contact and included circumstances concerning her removal from parental custody, prolonged residence with Coleman while she was a minor, and conduct occurring across multiple jurisdictions. The complete governmental and institutional record concerning what was reported, investigated, communicated, and ultimately charged has not been available to Perez throughout the subsequent civil litigation.

138. The 2016 criminal investigation is material to the present action for an additional reason: it preceded MBIC's 2017–2018 policy. Thus, by the time KIPP DC obtained the MBIC coverage subsequently invoked in connection with litigation arising from Perez's allegations, substantial events concerning Coleman had already occurred publicly and institutionally.

139. Perez does not presently know what KIPP DC disclosed to MBIC or its insurance professionals concerning the earlier reports, the 2016 criminal investigation, Coleman's arrest, the criminal proceedings, or the possibility of civil claims when the 2017–2018 coverage was applied for, issued, renewed, or otherwise underwritten.

140. Nor does Perez presently possess the complete underwriting file necessary to determine what MBIC independently knew concerning those circumstances when it evaluated KIPP DC's risk and issued the relevant coverage.

141. By 2018, however, MBIC indisputably had direct notice of civil litigation arising from the Coleman allegations. MBIC thereafter communicated with KIPP DC concerning coverage, issued a reservation of rights, and participated in KIPP DC's defense.

142. MBIC subsequently participated in KIPP DC's defense of *Perez v. KIPP DC*, including through the dismissal of that action and the ensuing appeal. MBIC therefore acquired substantial exposure over time to the allegations, pleadings, defense strategy, coverage issues, and information relevant to KIPP DC's potential liability.

143. During the Underlying Litigation, Perez sought discovery concerning KIPP DC's historical knowledge and institutional response. Perez alleges that information material to those issues emerged incrementally, including information concerning prior complaints, communications among institutional actors, historical insurance, and other matters bearing upon what KIPP DC knew and when it knew it.

144. Perez further alleges that KIPP DC maintained substantially greater access than Perez to its historical institutional records, employees and former employees, insurance records, insurers, brokers, defense counsel, and other sources capable of reconstructing the relevant chronology.

145. That disparity became particularly significant with respect to insurance. As described above, Perez repeatedly sought historical insurance information. KIPP DC ultimately acknowledged that additional Hartford occurrence policies existed but affirmatively determined that certain policies would not be produced because KIPP DC considered them inapplicable to Perez's claims.

146. KIPP DC therefore possessed information concerning a broader historical insurance program than the insurance materials initially available to Perez and exercised its own judgment concerning which portions of that history Perez was entitled to receive.

147. Perez alleges that historical insurance information was material not merely to the amount available to satisfy a potential judgment, but also to identifying contemporaneous notices of claims or circumstances, prior reports to insurers, loss histories, applications and renewals, communications with brokers, coverage determinations, and other records capable of demonstrating what KIPP DC reported about Coleman and when.

148. Such information was particularly material because contemporaneous insurance records may provide evidence independent of later witness recollection concerning whether KIPP DC reported an incident, allegation, circumstance, potential claim, or loss involving Coleman or Perez.

149. On November 5, 2024, while the Underlying Litigation remained pending, MBIC commenced this declaratory-judgment action. Through that action, MBIC sought judicial relief concerning the scope of insurance coverage for the same underlying claims for which it had participated in KIPP DC's defense.

150. Perez alleges that the commencement of the declaratory-judgment action created an additional and substantial information asymmetry. KIPP DC and MBIC possessed their respective insurance, claims-handling, coverage, and communications records, while Perez—although named as a defendant whose interests would be directly affected by the requested declaration—did not possess the complete historical record concerning those matters.

151. At the same time, KIPP DC remained engaged in the Underlying Litigation and subject to applicable discovery and supplementation obligations arising therefrom. Perez alleges that information bearing upon insurance coverage, historical notice, and the handling of the Coleman allegations therefore existed at the intersection of the two proceedings.

152. Perez repeatedly sought historical insurance information from KIPP DC, including policies covering portions of the relevant historical period. KIPP DC maintained that the Hartford policy produced to Perez and the Hanover/ MBIC policy involved here were the policies providing coverage involved here were the policies providing coverage for the

underlying litigation. When Perez continued to press the issue, KIPP DC acknowledged the existence of additional Hartford policies but maintained that they were inapplicable and non-discoverable. Perez alleges that this placed KIPP DC, while defending against her claims, in the position of determining in the first instance which portions of its historical insurance record she would receive.

153. MBIC separately possessed information concerning its underwriting, claims handling, reservation of rights, defense expenditures, communications with KIPPDC, and evaluation of the underlying allegations that was unavailable to Perez when MBIC sought declaratory relief concerning her interests. Perez does not infer unlawful concealment merely from the insurer-insured relationship; rather, she alleges that factual development is necessary to determine when MBIC learned material information concerning KIPP DC's historical knowledge and insurance disclosures, what information it possessed that Perez did not, what information it took after acquiring that information, and the nature of relevant communications among MBIC, KIPP DC, and their insurance professionals, and counsel.

154. As a result of the alleged withholding, delayed disclosure, and piecemeal revelation of material information, Perez alleges that she was prevented from possessing the same factual record available to the institutional and insurance parties concerning the history of the allegations, KIPP DC's notice, the insurance relationships implicated by those allegations, and the manner in which those matters had been reported and handled.

155. Perez alleges that the resulting information disparity impaired her ability to timely investigate potential claims, evaluate coverage, pursue discovery, identify responsible actors, test representations concerning historical notice, and protect her interests in both the Underlying Litigation and this declaratory-judgment action.

156. Perez alleges that the foregoing conduct, considered together with the additional acts alleged below, forms part of a continuing course of concealment of material facts concerning KIPP DC's historical knowledge, institutional response, insurance relationships, and handling of Perez's allegations.

## Criminal Investigation, Institutional Failure-to-Report Investigation, and Subsequent Charging Determination

157. In April 2016, Perez personally reported Coleman's conduct to the Metropolitan Police Department ("MPD"), initiating a criminal investigation into conduct that began while Perez was a minor.

158. The conduct reported by Perez was not limited to isolated acts of sexual abuse. Perez reported that Coleman, her former KIPP DC teacher, had groomed and sexually abused her while she was a minor; that she had been kidnapped and removed from parental custody; that the kidnapping continued for a prolonged period; and that Coleman transported Perez across state and jurisdictional boundaries.

159. The investigation did not arise in a factual vacuum. Years earlier, KIPP DC personnel had allegedly received complaints and warnings concerning Coleman's conduct toward Perez. Perez further alleges that, in 2007, her mother directly notified KIPP DC that her minor daughter had been kidnapped by Coleman and sought intervention concerning KIPP DC's former employee.

160. Perez alleges that the foregoing conduct, considered together with the conduct alleged below, forms part of a continuing course of alleged concealment of material facts concerning KIPP DC's historical knowledge, institutional response, insurance relationships, and handling of Perez's allegations.

161. The criminal investigation also examined the conduct of institutional actors who allegedly possessed information concerning Coleman and failed to report suspected sexual abuse as required by law.

162. MPD generated Public Incident Report No. 16191177, identifying Perez as the victim and recording the offense "Failure To Make A Report–Sexual Abuse," D.C. Code § 4-1321.02(e). The report identifies the offense as "COMPLETED" rather than attempted.

163. The MPD report identifies Detectives Phuson Nguyen and Joseph Hudson in connection with the investigation. It further identifies Capital City Public Charter School as an offense location and reflects an offense-date period of March 4, 2015 through July 2, 2015.

164. The investigation into institutional failures subsequently included KIPP DC officials Susan Schaeffler and Karen Dresden. By January 2018, the Office of the Attorney General for the District of Columbia ("OAG") was actively considering potential criminal charges against Schaeffler and Dresden.

165. On January 19, 2018, Peter Saba, then Chief of OAG's Criminal Section, wrote directly to Perez concerning the investigation. Saba informed Perez that he had sent letters to both Schaeffler and Dresden "informing them of our investigation and potential charges."

166. Saba further informed Perez that attorneys representing Schaeffler and Dresden had contacted him in response to those letters and that he intended to meet separately with their respective attorneys on January 25, 2018.

167. Saba expressly advised Perez that information obtained during those meetings would bear upon OAG's ultimate charging determination. He informed Perez that, "based on information gathered during those meetings," OAG would begin formulating its "final position on whether to charge or not."

168. Accordingly, the documentary record establishes that the governmental investigation extended beyond Coleman: MPD had formally documented a completed failure-to-report-sexual-abuse offense, and OAG subsequently notified Schaeffler and Dresden that they were subjects of an investigation involving potential charges.

169. The record further establishes that OAG's ultimate charging determination was not finalized before the January 25, 2018 meetings. Instead, OAG expressly intended to

consider information obtained from attorneys representing Schaeffler and Dresden before formulating its final position concerning prosecution.

170. Perez does not presently possess the complete record concerning those January 25, 2018 meetings, including the identities and affiliations of all participating attorneys, contemporaneous notes or memoranda, attorney proffers, documents or information supplied to OAG, communications preceding or following the meetings, or the complete record memorializing OAG's ultimate charging determination.

171. Nor does Perez presently know whether the investigation was ultimately resolved through an ordinary prosecutorial declination, a non-prosecution or other agreement, an exercise of prosecutorial discretion, or another disposition. Perez does not allege the existence of any particular agreement absent discovery of evidence establishing one.

172. The substance of the January 2018 communications and the basis for the ultimate charging determination are material because Schaeffler's and Dresden's knowledge of and responses to earlier reports concerning Coleman bear directly upon Perez's allegations concerning KIPP DC's institutional notice, reporting obligations, and subsequent representations concerning what its personnel knew and when they knew it.

173. The timing is independently material to the insurance issues presented in this action. OAG's investigation of Schaeffler and Dresden, its notification of potential charges, and the January 2018 defense-attorney meetings occurred during the July 1, 2017 through July 2018 MBIC/Hanover policy period. Thus, during the operative policy period, governmental authorities were evaluating potential criminal liability arising not merely from Coleman's historical misconduct, but from the alleged conduct of institutional officials associated with KIPP DC.

174. Perez does not presently know when MBIC learned of the investigation concerning Schaeffler and Dresden; whether KIPP DC, Schaeffler, Dresden, their counsel, or any insurance broker reported the investigation or potential charges to MBIC; whether MBIC received notice of those circumstances before the commencement of the 2018 civil

litigation; or whether any insurer participated in retaining, funding, or communicating with counsel representing Schaeffler or Dresden in connection with the investigation.

175. Those facts are particularly material because MBIC subsequently undertook KIPP DC's defense in civil litigation arising from the same underlying circumstances and thereafter continued defending KIPP DC in *Perez v. KIPP DC*, including through the appeal and remand of that action.

176. Perez alleges that the complete investigative record- including OAG's communications notifying Scheffler and Dresden of potential charges, records of the January 25, 2018 meetings, materials supplied to OAG, and records memorializing the ultimate charging determination- is material to determining what information concerning KIPP DC's historical knowledge and institutional conduct was presented to governmental authorities, whether those representations were complete and consistent with the record subsequently developed in civil litigation, and when that information became known to KIPP DC's insurer.

177. Perez alleges that the absence of that complete record, considered together with the disputed and delayed insurance disclosures alleged above, has prevented her from fully reconstructing what KIPP DC and it's officials knew, what they communicated to governmental authorities and insurers, what information may have been materially narrowed, and when MBIC acquired knowledge of those circumstances. Perez alleges that these matters form part of the broader course of concealment alleged in this counterclaim.

## Civil Litigation, Continuing Disclosure Obligations, and the Alleged Continuation of the Concealment

178. The conclusion of the criminal investigation did not eliminate the significance of information concerning KIPP DC's historical knowledge, institutional conduct, or response to reports concerning Coleman. Those same facts subsequently became material to civil litigation; including questions arising from the underlying conduct, including questions concerning KIPP DC's notice, reporting obligations, institutional response, and potential liability.

179. In 2018, civil litigation commenced against KIPP DC arising from Coleman's conduct and KIPP DC's alleged institutional failures. By that time, KIPP DC and its officials had already been the subjects of years of factual development concerning Coleman, including the 2016 criminal investigation and OAG's investigation of potential criminal liability arising from institutional failures to report suspected sexual abuse.

180. MBIC/Hanover thereafter became directly involved in KIPP DC's defense. MBIC issued reservation-of-rights correspondence and provided or funded KIPP DC's defense notwithstanding the historical circumstances preceding the 2017–2018 policy. MBIC's involvement in the civil litigation gave it access to information concerning the nature of Perez's allegations, the criminal proceedings, KIPP DC's asserted defenses, the historical conduct of KIPP DC personnel, and facts potentially relevant to both liability and insurance coverage.

181. Following amendments to District of Columbia law extending the limitations period applicable to claims arising from childhood sexual abuse, Perez commenced *Perez v. KIPP DC Supporting Corporation*, No. 1:21-cv-00929, in April 2021. KIPP DC defended that action with the benefit of insurance-funded representation, including funding or defense provided by MBIC.

182. In February 2022, the District Court dismissed Perez's claims against KIPP DC on res judicata grounds. Perez appealed, the D.C. Circuit reversed, and the action returned to the District Court for further proceedings and factual discovery. Throughout the appellate proceedings, MBIC continued funding and providing KIPP DC's defense. Accordingly, from the commencement of the predecessor litigation in 2018 through the D.C. Circuit proceedings concluding in 2023, MBIC continuously participated in and funded KIPP DC's defense of civil claims arising from Perez's allegations.

183. MBIC continued funding or providing KIPP DC's defense during the appellate proceedings. The Court of Appeals subsequently reversed the dismissal and returned the case to the District Court for further proceedings.

184. Following remand, the Underlying Litigation proceeded into factual discovery. The central disputed issues included what KIPP DC and its personnel knew concerning Coleman, when they acquired that knowledge, what reports and complaints had been made, and what actions KIPP DC took or failed to take in response.

185. Those issues substantially overlapped with matters that had previously been investigated by MPD and OAG, including the knowledge and conduct of institutional personnel and alleged failures to report suspected sexual abuse.

186. KIPP DC therefore entered discovery possessing substantially greater access than Perez to its historical institutional records, current and former personnel, communications, insurance relationships, defense records, and information concerning its interactions with governmental authorities.

187. Perez alleges that discovery did not result in the prompt disclosure of a complete historical record. Instead, material information concerning KIPP DC's alleged notice, institutional communications, insurance history, and other matters bearing upon its knowledge and conduct emerged incrementally.

188. Perez identified concerns regarding deficiencies in discovery while she remained represented by counsel and raised certain of those concerns with her attorneys. Perez alleges that counsel did not adequately pursue or resolve those discovery disputes, took positions that Perez believed aligned with or preserved KIPP DC's litigation position rather than her own interests, contributing to Perez's decision to terminate the representation. Perez alleges that her concern regarding that alignment was subsequently reinforced when her former counsel joined with KIPP DC in this declaratory-judgment action. Perez alleges this subsequent joinder as circumstantial context concerning the positions taken during the prior representation, while the existence and full significance of the underlying discovery deficiencies became substantially clearer after Perez assumed responsibility for the Underlying Litigation and independently reviewed record.

189. In August 2025, Perez assumed responsibility for litigating the Underlying Litigation pro se. Upon independently reviewing the discovery record, deposition testimony,

insurance materials, prior proceedings, and other evidence. Perez identified what she alleges were material omissions, inconsistencies, and gaps concerning KIPP DC's historical insurance coverage, institutional notice, communications concerning Coleman, prior complaints, governmental investigations, and other information bearing upon KIPP DC's knowledge and response, and thereafter sought additional factual development concerning those matters.

190. KIPP DC has maintained that discovery in the Underlying Litigation is closed. Perez, however, alleges that the closing of the original discovery period did not eliminate any otherwise applicable obligation to correct or supplement qualifying prior disclosures or discovery responses that a party learned were materially incomplete or incorrect.

191. The insurance disclosures described above illustrate the resulting dispute. Perez sought the historical policies applicable to the periods implicated by her allegations. Additional insurance information was produced or explained only after Perez repeatedly challenged the completeness of the insurance record.

192. KIPP DC ultimately acknowledged the existence of additional Hartford occurrence policies while maintaining that policies it deemed incapable of responding to Perez's judgment were inapplicable and outside the insurance agreements required to be disclosed.

193. Perez alleges that the distinction is significant to the broader factual investigation because historical insurance records may contain contemporaneous evidence concerning notices of circumstances, reports of potential claims, communications with insurers and brokers, loss histories, applications, renewals, and other records capable of establishing what KIPP DC knew or reported concerning Coleman at particular points in time.

194. While these factual disputes remained unresolved, MBIC commenced the present declaratory-judgment action on November 5, 2024, creating overlapping proceedings concerning the same underlying factual circumstances. In the underlying litigation, KIPP DC continued defending against Perez's allegations concerning its historical knowledge and institutional conduct, while in this action MBIC and KIPP DC litigated the existence

and scope of insurance coverage for liability arising from those same allegations. The coverage dispute therefore implicated additional information concerning historical notice, proper proceedings, insurance reporting, claims handling, and other factual circumstances material to Perez's claims.

195. Perez does not allege that the mere existence of a declaratory-judgment action required MBIC to produce its entire claims or underwriting files to her in the separate Underlying Litigation. Nor does Perez allege that MBIC automatically assumed KIPP DC's discovery obligations merely because MBIC insured and defended KIPP DC. Perez instead alleges that KIPP DC remained responsible for its own applicable disclosure, discovery-response, and supplementation obligations and that MBIC separately possessed material information acquired through underwriting, claims handling, coverage analysis, and years of participation in KIPP DC's defense.

196. The factual question presented by the intersection of the two proceedings is therefore whether information known to or exchanged among KIPP DC, MBIC, their insurers, brokers, agents, and counsel demonstrated that prior representations or discovery responses concerning matters material to Perez's claims were incomplete or inaccurate and, if so, what actions were taken after that information became known.

197. Perez presently lacks the complete nonprivileged communications and records necessary to answer that question. The respective dates upon which KIPP DC and MBIC acquired particular information, what information was exchanged between them, and what actions followed remain matters requiring factual development.

198. Perez alleges that the sequence described above—from the historical reports concerning Coleman, through the criminal investigation and investigation of institutional actors, through the subsequent civil litigation and insurance disclosures—demonstrates repeated instances in which material portions of the factual record became available to Perez only incrementally and after substantial delay.

199. Perez alleges that these circumstances impaired her ability to investigate the complete factual basis of her claims, identify all potentially responsible actors, test representations

concerning KIPP DC's historical knowledge, obtain contemporaneous evidence, evaluate available insurance coverage, and litigate the Underlying Litigation on a complete factual record.

200. Perez further alleges that, to the extent discovery establishes that any Counterclaim Defendant knowingly withheld material information, caused materially incomplete information to be communicated, or knowingly assisted another actor in maintaining such concealment after becoming aware of the underlying conduct, those acts constitute part of the continuing course of conduct for which Perez seeks relief in this Counterclaim.

201. The remaining factual inquiry arising from the intersection of the two proceedings is therefore whether information known to or exchanged among KIPP DC, MBIC, their insurers, brokers, agents, and counsel demonstrated that prior representations or discovery responses concerning matters material to Perez's claims were incomplete or inaccurate and, if so, what actions were taken after that information became known. Perez presently lacks the complete nonprivileged communications and records necessary to answer that question. The respective dates upon which KIPP DC and MBIC acquired particular information, what information was exchanged between them, and what actions followed remain matters requiring factual development

**MBIC's Knowledge, Continuing Assistance, and Commencement of the Declaratory-Judgment Action**

202. MBIC entered the relevant events no later than the 2017–2018 policy period, after substantial events concerning Coleman, Perez, and KIPP DC had already occurred.

203. Before the inception of the MBIC/Hanover policy, KIPP DC personnel had allegedly received complaints and warnings concerning Coleman's conduct toward Perez; Perez's mother had reported in 2007 that her minor daughter had been kidnapped by Coleman; Perez had reported Coleman's conduct to MPD in April 2016; Coleman had been apprehended in Florida with the involvement of the United States Marshals Service in May 2016; and criminal proceedings arising from Perez's allegations had commenced.

204. The governmental investigation subsequently extended beyond Coleman himself. As alleged above, MPD generated Public Incident Report No. 16191177 identifying Perez as

the victim and documenting the completed offense of "Failure To Make A Report–Sexual Abuse."

205. By January 2018, during the MBIC/Hanover policy period, the Office of the Attorney General for the District of Columbia ("OAG") was also investigating Susan Schaeffler and Karen Dresden and considering potential criminal charges against them.

206. On January 19, 2018, Peter Saba, then Chief of OAG's Criminal Section, informed Perez in writing that he had sent letters to Schaeffler and Dresden notifying them of OAG's investigation and "potential charges"; that attorneys representing each woman had contacted him; and that separate meetings with their attorneys were scheduled for January 25, 2018.

207. Saba further informed Perez that, based upon information gathered during those meetings, OAG would begin formulating its "final position on whether to charge or not."

208. Accordingly, during the operative MBIC/Hanover policy period, governmental authorities were not merely addressing historical misconduct committed by Coleman. OAG was actively evaluating potential criminal liability arising from the conduct of institutional officials associated with KIPP DC.

209. These circumstances are material to determining what KIPP DC disclosed to MBIC or its insurance professionals during the application, underwriting, issuance, or administration of the 2017–2018 policy and what MBIC knew or subsequently learned concerning the historical circumstances underlying the risk it insured.

210. Perez does not presently possess MBIC's complete underwriting file or the complete nonprivileged communications among MBIC, KIPP DC, KIPP DC's insurance brokers, and other insurance professionals concerning procurement, underwriting and of the 2017–2018 policy. Perez therefore does not presently know whether KIPP DC disclosed the prior complaints concerning Coleman, Perez's mother's 2007 report, the 2016

criminal investigation, OAG's investigation of Schaeffler and Dresden or consideration of potential charges, or whether MBIC independently acquired any of that information.

211. Perez therefore does not presently know whether KIPP DC disclosed to MBIC the prior complaints concerning Coleman; Perez's mother's 2007 report that Perez had been kidnapped by Coleman; the 2016 criminal investigation; Coleman's arrest and prosecution; MPD's failure-to-report investigation; OAG's investigation of Schaeffler and Dresden; OAG's consideration of potential charges; or other circumstances potentially giving rise to institutional civil liability.

212. Nor does Perez presently know whether MBIC independently acquired any of that information during underwriting or administration of the policy.

213. By 2018, however, MBIC indisputably possessed direct notice that civil claims arising from Coleman's conduct and KIPP DC's alleged institutional failures had been asserted. MBIC thereafter evaluated coverage, communicated with KIPP DC concerning its insurance obligations, issued reservation-of-rights correspondence, and undertook or funded KIPP DC's defense.

214. MBIC's involvement continued thereafter. When Perez commenced Perez v. KIPP DC Supporting Corporation, No. 1:21-cv-00929, in April 2021, MBIC again undertook or funded KIPP DC's defense and continued doing so after dismissal in the District Court, throughout Perez's appeal to the United States Court of Appeals for the District of Columbia Circuit, and following the reversal and remand. MBIC thus maintained a continuing insurer-insured and defense relationship with KIPP DC across multiple years and stages of litigation arising from the same underlying historical circumstances.

215. Through that continuing relationship, MBIC repeatedly evaluated its coverage position and whether and upon what terms it would continue defending KIPP DC. The factual record available to MBIC when making those determinations, and the extent to which that record developed over time,  remain principally within MBIC's and KIPP DC's possession.

216. Perez does not allege that MBIC's payment of defense costs or representation of its coverage interests, standing alone, constitutes wrongful conduct. An insurer may lawfully defend its insured, including subject to a reservation of rights.

217. Rather, MBIC's continuing participation is material because it created repeated opportunities for MBIC to acquire information concerning KIPP DC's historical knowledge, institutional conduct, reporting failures, and related matters while MBIC continued evaluating coverage and providing or funding KIPP DC's defense.

218. Factual development is therefore necessary to determine when and to what extent MBIC learned of the historical complaints concerning Coleman; Perez's mother's 2007 kidnapping report; the nature and scope of the 2016 criminal investigation; and institutional failure-to-report investigation and potential charges against KIPP DC officials; KIPP DC's historical charges against KIPP DC officials; KIPP DC's historical insurance relationships and prior notices to insurers; and information subsequently developed concerning KIPP DC's historical notice and institutional response.

219. Those dates are material because MBIC's alleged secondary liability does not arise merely from its status as KIPP DC's insurer. It turns upon what MBIC knew concerning the alleged underlying tortious conduct when it provided particular forms of assistance, the nature and duration of that assistance, and what MBIC did after acquiring such knowledge.

**Commencement of the Declaratory-Judgment Action During Discovery**

220. The chronology became particularly significant on November 5, 2024, when MBIC commenced the present declaratory-judgment action while factual discovery and development in the Underlying Litigation were ongoing.

221. MBIC did not discontinue KIPP DC's defense, and remain outside the litigation. MBIC affirmatively invoked this Court's jurisdiction, named KIPP DC and Perez as defendants, and sought judicial declarations concerning its continuing obligations under the 2017–2018 policy for the claims being litigated in the underlying litigation.

222. KIPP DC was therefore simultaneously defending against Perez's allegations and participating in discovery concerning its historical knowledge and institutional conduct in the underlying litigation, while litigating with MBIC concerning insurance coverage arising from the same underlying circumstances. Commencement of the declaratory-judgment action did not terminate KIPP DC's existing discovery obligations in the underlying litigation.

223. During discovery in the Underlying Litigation, KIPP DC remained subject to its applicable obligations under the Federal Rules of Civil Procedure, including its obligations concerning insurance agreements under Rule 26(a)(1)(A)(iv), its obligations to provide complete responses to properly served discovery, and its obligation under Rule 26(e) to timely supplement or correct qualifying disclosures or discovery responses upon learning that they were materially incomplete or incorrect and that the additional or corrective information had not otherwise been made known to Perez during discovery or in writing.

224. The simultaneous coverage dispute created an additional context in which KIPP DC could receive, review, generate, or identify information concerning insurance agreements, historical insurance coverage, prior claims or circumstances, notices to insurers, tenders, coverage positions, and other matters potentially responsive to discovery previously served in the Underlying Litigation. To the extent information developed or exchanged in the coverage dispute demonstrated that a qualifying prior disclosure or discovery was materially incomplete or incorrect, Perez alleges that KIPP DC remained subject to applicable supplementation or correction obligation; that obligation did not disappear merely because the information was learned through communications with its insurer or development of the separate coverage dispute.

225. Insurance disclosures are particularly significant because rule 26(a)(1)(A)(iv) requires disclosure of insurance agreements under which an insurance business may be liable to satisfy all or part of a possible judgment or to indemnify or reimburse payments made to satisfy such a judgment.

226. As alleged above, Perez subsequently learned that KIPP DC's historical insurance program was broader than the policies initially available to her, and KIPP DC later acknowledged the existence of additional Hartford occurrence policies while maintaining that certain policies were not required to be produced because, under KIPP DC's interpretation of Perez's allegations and the policies, they could not respond to a judgment in the underlying litigation. The historical insurance record is material not merely to identify funds potentially available to satisfy a judgment, but because it may contain contemporaneous notices of incidents or circumstances, prior claims, tenders, communications with insurers or brokers, and other records bearing upon what KIPP DC knew, what it reported, and when it reported it.

227. MBIC was not itself a party to the underlying litigation, and Perez does not allege that commencement of this declaratory-judgment action, standing alone, subjected MBIC to KIPP DC's Rule 26 obligations in that separate proceeding.

228. MBIC's role is nevertheless material because MBIC possessed its own policy, underwriting, claims-handling, reservation-of-rights, coverage-analysis, and defense information and was communicating with KIPP DC concerning coverage during a period in which KIPP DC remained engaged in discovery concerning the underlying circumstances.

229. Factual development is therefore necessary to determine what material information concerning coverage and the underlying historical circumstances was exchanged by MBIC and KIPP DC during that period; whether any such information demonstrated that a qualifying disclosure or discovery response by KIPP DC was materially incomplete or incorrect; what KIPP DC did after receiving such information; and whether MBIC subsequently became aware that material information remained undisclosed.

230. Perez alleges that the temporal overlap between the underlying litigation and this declaratory-judgment action is material to the alleged secondary-liability action theory because it identified a period during which KIPP DC remained subject to applicable disclosure and supplementation obligations while MBIC was simultaneously acquiring, evaluating, and exchanging information concerning coverage and the same underlying historical circumstances.

## MBIC's Knowledge, Continuing Assistance, and Commencement of the Declaratory-Judgment Action

231. Massachusetts Bay Insurance Company ("MBIC") entered the relevant chronology no later than the 2017–2018 policy period, after substantial events concerning Coleman, Perez, and KIPP DC had already occurred.

232. Before the inception of the MBIC/Hanover policy, KIPP DC personnel had allegedly received complaints and warnings concerning Coleman's conduct toward Perez; Perez's mother had reported in 2007 that her minor daughter had been kidnapped by Coleman; Perez had reported Coleman's conduct to MPD in April 2016; Coleman had been apprehended in Florida with the involvement of the United States Marshals Service in May 2016; and criminal proceedings arising from Perez's allegations had commenced.

233. The governmental investigation subsequently extended beyond Coleman himself. As alleged above, MPD generated Public Incident Report No. 16191177 identifying Perez as the victim, identifying the investigated offense as "Failure To Make A Report–Sexual Abuse," and recording the offense status as "COMPLETED."

234. During the operative MBIC/Hanover policy period, the governmental investigation had extended beyond Coleman to potential criminal liability arising from the conduct of KIPP DC officials. By January 2018, OAG was investigating Susan Schaeffler Ettinger and Karen Dresden, had notified them of potential charges, and intended to consider information obtained from meetings with their attorneys before determining whether to prosecute. These circumstances are material here not to relitigate that investigation, but because they bear directly upon what KIPP DC disclosed to MBIC during the application, underwriting, issuance, or administration of the 2017-2018 policy and what MBIC independently knew or subsequently learned concerning the historical circumstances underlying the risk it insured.

235. Perez does not presently possess MBIC's complete underwriting file or the complete nonprivileged communications among MBIC, KIPP DC, KIPP DC's insurance brokers, and other insurance professionals concerning procurement and underwriting of the 2017–2018 policy. Perez therefore does not presently know whether KIPP DC

disclosed-or whether MBIC independently acquired information concerning- the prior complaints concerning Coleman; Perez's mother's 2007 report that Perez had been kidnapped by Coleman; the 2016 criminal investigation; Coleman's arrest and prosecution; MPD's failure-to-report investigation; OAG's investigation of Schaeffler and Dresden; OAG's consideration of potential charges; or other circumstances potentially giving rise to institutional civil liability.

236. By 2018, however, MBIC indisputably possessed direct notice that civil claims arising from Coleman's conduct and KIPP DC's alleged institutional failures had been asserted. MBIC thereafter evaluated coverage, communicated with KIPP DC concerning its insurance obligations, issued reservation-of-rights correspondence, and undertook or funded KIPP DC's defense.

237. MBIC's involvement continued thereafter. When Perez commenced *Perez v. KIPP DC Supporting Corporation*, No. 1:21-cv-00929, in April 2021, MBIC again undertook or funded KIPP DC's defense and continued doing so after the District Court dismissed Perez's action, throughout Perez's appeal to the United States Court of Appeals for the District of Columbia Circuit, and following reversal and remand. MBIC thus maintained a continuing insurer-insured and defense relationship with KIPP DC spanning multiple years and stages of litigation arising from the same underlying historical circumstances.

238. Through that continuing relationship, MBIC necessarily acquired information sufficient to make repeated claims-handling and coverage decisions concerning whether and upon what terms it would continue defending KIPP DC. Perez alleges that the complete factual record upon which MBIC made those determinations remains principally within MBIC's and KIPP DC's possession.

239. Perez does not allege that MBIC's payment of defense costs or representation of its coverage interests, standing alone, constitutes wrongful conduct. An insurer may lawfully defend its insured, including subject to a reservation of rights. Rather, MBIC's continuing participation is material because its knowledge necessarily developed over time while the alleged concealment of KIPP DC's historical knowledge, institutional conduct, reporting failures, and related information allegedly continued.

240. Specifically, factual development is necessary to determine when MBIC learned of: (a) the historical complaints and warnings concerning Coleman; (b) Perez's mother's 2007 report that Coleman had kidnapped Perez; (c) the nature and scope of the 2016 criminal investigation; (d) the institutional failure-to-report investigation; (e) OAG's investigation and consideration of potential charges against Schaeffler and Dresden; (f) KIPP DC's historical insurance relationships and any prior notices to insurers; and (g) information subsequently developed during the civil litigation concerning KIPP DC's historical notice and institutional response.

241. Those dates are material because MBIC's alleged secondary liability does not arise merely from its status as KIPP DC's insurer. It turns upon what MBIC knew concerning the alleged underlying tortious conduct when it provided particular forms of assistance, the nature and duration of that assistance, and what MBIC did after acquiring such knowledge.

**Commencement of the Declaratory-Judgment Action During Discovery**

242. The chronology became particularly significant on November 5, 2024, when MBIC commenced the present declaratory-judgment action while factual discovery and development in the Underlying Litigation were ongoing.

243. MBIC did not merely discontinue KIPP DC's defense and remain outside the litigation. Instead, MBIC affirmatively invoked this Court's jurisdiction, named KIPP DC and Perez as defendants, and sought judicial declarations concerning its continuing obligations under the 2017–2018 policy for the claims being litigated in the Underlying Litigation.

244. Accordingly, during the same period, KIPP DC was simultaneously: (a) defending against Perez's factual allegations concerning its historical knowledge and institutional conduct in the Underlying Litigation; (b) participating in discovery concerning those allegations; and (c) litigating with MBIC concerning insurance coverage for liability arising from those same underlying circumstances.

245. The commencement of the declaratory-judgment action did not terminate KIPP DC's existing discovery obligations in the Underlying Litigation.

246. Throughout that continuing relationship, MBIC necessarily made repeated claims-handling, coverage, and defense-funding decisions concerning KIPP DC and claims arising from Perez's allegations. The nature and extent of the information available to MBIC when it made those decisions, when particular information information concerning KIPP DC's historical knowledge and institutional conduct became known to MBIC, and what actions MBIC took after acquiring such information such information remain matters requiring factual development and are principally within MBIC's and KIPP DC's possession.

247. The simultaneous coverage dispute created an additional context in which KIPP DC could receive, review, generate, or identify information concerning insurance agreements, historical insurance coverage, prior claims or circumstances, notices to insurers, tenders, coverage positions, and other matters potentially responsive to discovery previously served in the Underlying Litigation.

248. Perez alleges that, to the extent information developed or exchanged during the coverage dispute demonstrated that an existing disclosure or discovery response by KIPP DC in the Underlying Litigation was materially incomplete or incorrect, KIPP DC remained obligated to supplement or correct that response to the extent required by the Federal Rules.

249. Perez further alleges that information otherwise subject to an applicable supplementation obligation did not cease to be subject to that obligation merely because KIPP DC learned the information through communications with its insurer or through the development of a separate coverage dispute.

250. Insurance disclosures are particularly significant to this chronology. Rule 26(a)(1)(A)(iv) required disclosure of insurance agreements under which an insurance business may be liable to satisfy all or part of a possible judgment or to indemnify or reimburse payments made to satisfy such a judgment.

251. As alleged above, Perez subsequently learned that KIPP DC's historical insurance program was broader than the policies initially available to her. KIPP DC later acknowledged the existence of additional Hartford occurrence policies while maintaining that certain policies were not required to be produced because, according to KIPP DC's interpretation of Perez's allegations and the policies, those policies could not respond to a judgment in the Underlying Litigation.

252. The significance of the historical insurance record extends beyond identifying funds potentially available to satisfy a judgment. Historical insurance records may also identify contemporaneous notices of incidents or circumstances, prior claims, tenders, communications with insurers or brokers, and other records bearing upon what KIPP DC knew, what it reported, and when it reported it.

253. Thus, while KIPP DC remained subject to discovery in the Underlying Litigation, MBIC and KIPP DC were simultaneously evaluating and litigating coverage arising from the same underlying factual circumstances.

254. MBIC was not itself a party to the Underlying Litigation, and Perez does not allege that commencement of this declaratory-judgment action automatically subjected MBIC to KIPP DC's Rule 26 obligations in that separate proceeding.

255. MBIC's role is nevertheless material because MBIC possessed its own policy, underwriting, claims-handling, reservation-of-rights, coverage-analysis, and defense information and was communicating with KIPP DC concerning coverage during a period in which KIPP DC remained engaged in discovery concerning the Underlying Litigation.

256. Accordingly, factual development is necessary to determine what material information concerning coverage and the underlying historical circumstances MBIC communicated to KIPP DC while KIPP DC remained subject to discovery and supplementation obligations in the underlying litigation; whether any such information demonstrated that a qualifying disclosure or discovery response by KIPP DC was materially incomplete or incorrect; what KIPP DC did after receiving such information; and whether MBIC subsequently became aware that material information known to KIPP

DC remained undisclosed or that a qualifying disclosure or discovery response remained materially incomplete or incorrect.

**MBIC's Knowledge and Alleged Continuing Assistance**

257. Perez alleges that the intersection between the two proceedings creates a critical factual and temporal bridge between KIPP DC's alleged underlying concealment and MBIC's potential subsequent knowledge and assistance.

258. By November 2024, MBIC had participated in the defense of litigation arising from Perez's allegations for years and had undertaken a coverage analysis sufficient to commence litigation seeking affirmative judicial relief concerning its obligations.

259. MBIC therefore possessed or controlled its own underwriting materials, claims files, reservation-of-rights materials, coverage analyses, defense records, and communications concerning KIPP DC's claims, subject to any legitimate privilege applicable to particular materials.

260. Perez alleges that MBIC and KIPP DC consequently possessed overlapping, although not necessarily identical, bodies of information concerning the underlying allegations, historical insurance coverage, claims handling, defense of the litigation, and matters relevant to the coverage dispute.

261. Perez does not presently possess the complete nonprivileged communications between MBIC and KIPP DC necessary to determine precisely what information was exchanged, when it was exchanged, or what either party understood concerning the completeness of KIPP DC's disclosures in the underlying litigation. Rather, factual development is necessary to determine what information was exchanged between MBIC and KIPP DC and when; whether MBIC possessed information materially inconsistent with representations or disclosures concerning KIPP DC's historical knowledge and institutional conduct; whether either party became aware that prior disclosures or discovery responses in the underlying litigation were materially incomplete or incorrect; and what actions followed such knowledge.

262. Perez further alleges that MBIC's knowledge must be evaluated cumulatively and chronologically. Information that may not have established meaningful awareness when MBIC first issued the policy could have acquired materially different significance after the 2018 civil litigation, MBIC's reservation-of-rights analysis, the 2021 underlying litigation, the appellate proceedings, factual discovery, and subsequent developments concerning KIPP DC's historical notice and insurance record.

263. That determination turns upon the nature, amount and duration of any assistance provided after MBIC acquired the requisite knowledge; MBIC's relationship with KIPP DC; the information available to MBIC at the relevant times; MBIC's state of mind; and whether particular conduct by MBIC substantially assisted the alleged continuing concealment. Perez alleges that, to the extent factual development establishes requisite knowledge and substantial assistance, MBIC is subject to secondary liability for the resulting injury.

264. Perez separately alleges that, to the extent factual development establishes an agreement, express or tacit, between MBIC and KIPP DC to accomplish an unlawful objective or to accomplish a lawful objective through unlawful means, together with an overt tortious act causing injury to Perez, those facts support Perez's separately pleaded civil-conspiracy claim.

265. Perez does not rely upon the insurer-insured relationship, MBIC's provision of a defense, or MBIC's commencement of a declaratory-judgment action, standing alone, to establish either theory.

266. Rather, Perez relies upon the chronology and cumulative development of MBIC's knowledge; the duration and nature of its relationship with KIPP DC; its repeated claims-handling, coverage and defense decisions; information accumulated through years of claims handling and litigation; the commencement of this action while factual discovery remained ongoing in the underlying litigation; information exchanged or developed during the overlapping proceedings; and MBIC's conduct after acquiring knowledge of the circumstances alleged herein. Considered together with KIPP DC's alleged underlying concealment and the additional conduct alleged herein, these circumstances provide the factual basis upon which discovery may establish whether and

when MBIC crossed the line from the lawful defense of its insured to knowing and substantial assistance of continuing tortious conduct, or separately entered an agreement sufficient to support civil-conspiracy liability.

**Perez's Requests for Supplementation and KIPP DC's Continuing Refusal**

267. After assuming responsibility for her own representation and independently reviewing the discovery record, Perez identified material gaps in KIPP DC's prior insurance disclosures and production and repeatedly sought supplementation of the insurance information produced in the Underlying Litigation.

268. Perez specifically sought historical insurance policies covering periods relevant to Coleman's conduct, KIPP DC's alleged institutional notice, and the resulting claims, including policies predating the 2017–2018 MBIC/Hanover policy.

269. KIPP DC nevertheless maintained that it had produced the policies applicable to Perez's claims and relied upon the closure of discovery in the underlying litigation as a basis for declining Perez's supplemental production. Perez does not contend that closure of discovery gives her an unrestricted right to initiate new discovery; rather, she alleges that closure does not extinguish an otherwise applicable obligation under Rule 26(e) to timely supplement or correct a qualifying prior disclosure or discovery response upon learning that it was materially incomplete or incorrect.

270. The dispute became concrete with respect to KIPP DC's historical insurance coverage. KIPP DC initially represented that the Hartford policy produced to Perez and the Hanover/MBIC policy at issue in this declaratory-judgment action were only policies providing coverage to KIPP DC in relation to Perez's claims.

271. After Perez continued challenging the completeness of that insurance history, KIPP DC acknowledged that additional Hartford occurrence policies existed, including policies covering May 8, 2003 through May 8, 2004, that had not been produced to Perez. KIPP DC did not contend that those policies were nonexistent or unavailable; rather, it stated that it had determined that the policies were not applicable because, under KIPP DC's interpretation of Perez's allegations and the policies, the alleged sexual abuse did not occur during those policy periods.

272. Perez alleges that whether a particular historical policy satisfies Rule 26(a)(1)(A)(iv) must be determined according to the policy and the claims potentially giving rise to liability. Perez disputes KIPP DC's determination that the additional historical policies fall categorically outside its disclosure obligations.

273. Perez alleges that, to the extent information obtained or developed through KIPP DC's communications with MBIC or the coverage litigation demonstrated that a qualifying prior disclosure or discovery response was materially incomplete or incorrect, KIPP DC remained obligated to supplement or correct that response to the extent required by Rule 26(e).

274. Perez does not allege as established fact the contents of communications she has not seen. She alleges, however, that KIPP DC's own written correspondence establishes that additional historical insurance policies existed, that those policies had not been produced to Perez, and that KIPP DC consciously declined to produce them based upon its own assessment of their applicability.

275. Perez further alleges that she expressly placed KIPP DC on notice that she disputed the completeness of its insurance disclosures and requested additional information and supplementation. KIPP DC nevertheless continues to maintain that no additional production is required, including on the ground that discovery in the Underlying Litigation has closed.

276. Perez alleges that KIPP DC's continued refusal after receiving notice of the asserted deficiencies is material to determining whether the incomplete disclosure of historical insurance information resulted from a good-faith disagreement concerning the scope of Rule 26, an erroneous coverage determination, or knowing concealment of material information.

277. The same chronology is material to Perez's secondary liability theory against MBIC. If factual development establishes that MBIC knew KIPP DC possessed, or had become

aware of information requiring supplementation or correction of a materially incomplete disclosure or discovery response; knew kIPP DC was continuing to withhold that information after being placed on notice of the asserted deficiency; and thereafter knowingly provided substantial assistance or encouragement facilitating the alleged concealment, Perez alleges that such conduct forms part of the factual basis for her aiding-and-abetting claim.

278. Perez accordingly seeks factual development concerning the complete historical insurance record; the disclosures and discovery responses previously made by KIPP DC; the information subsequently acquired by KIPP DC through MBIC and the coverage dispute; the dates upon which material information became known; the parties' nonprivileged communications concerning disclosure and supplementation; and the factual basis for KIPP DC's continuing refusal to provide further supplementation. Those facts are material to determining the completeness of KIPP DC's prior disclosures, the nature and duration of the alleged continuing concealment, MBIC's developing knowledge of that conduct, and whether either Counter/Crossclaim Defendant thereafter engaged in conduct giving rise to the liability alleged in the counts below.

## CAUSES OF ACTION

### COUNT I

### Fraudulent Misrepresentations and Willful Omissions

### Counterclaim Cross Defendant KIPP DC

279. Counterclaim Plaintiff Perez incorporates by reference the preceding allegations of this Counterclaim as though fully set forth herein.

280. Perez asserts this claim against KIPP DC for common-law fraud arising from materially false representations and willful omissions concerning subjects as to which KIPP DC possessed material historical and institutional knowledge, including: (a) KIPP DC's knowledge of Alan Coleman's conduct toward Perez and other minor female students; (b)complaints, warnings , observations, and reports concerning Coleman;

(c)Perez's mother's 2007 report that Coleman had kidnapped Perez; (d) KIPP DC's knowledge of and institutional response to that report and related circumstances; (e) subsequent governmental investigation concerning institutional knowledge and reporting failures; (f) KIPP DC;s historical insurance, underwriting, notice and related records; and (g) materially incomplete or inaccurate representations and disclosures concerning those subject during the underlying litigation.

281. The claim does not rest upon silence alone, nor does Perez allege that KIPP DC had a generalized obligation to volunteer every fact within its possession. Perez alleges that KIPP DC made affirmative representations and partial disclosures concerning the subjects identified above while knowingly omitting material information necessary to make those representations complete and nonmisleading, and that KIPP DC failed to correct or supplement qualifying representations after their material incompleteness or accuracy became known. The actionable conduct alleged herein therefore concerns what KIPP DC affirmatively represented, what KIPP DC knew concerning the truth or falsity of the account presented, and Perez's reliance upon those representations and disclosures to her detriment.

**A. Material Misrepresentations and Willful Omissions**

282. KIPP DC possessed material information concerning Coleman's relationship with Perez while Coleman was employed by KIPP DC as Perez's teacher and Perez was a minor. That information was not limited to a single allegation or retrospective accusation. As alleged above, KIPP DC personnel observed and received information concerning a pattern of conduct by Coleman toward Perez consistent with escalating boundary violations and grooming behavior, including Coleman arranging for facilitating repeated access to Perez before and after school; isolating or spending time alone with her in his classroom; transporting her outside ordinary school transportation arrangements; initiating and permitting inappropriate physical familiarity; cultivating unusual access to and involvement in her daily activities; and progressively blurring the professional physical, and interpersonal boundaries ordinarily separating an adult caucasian male teacher and a fourteen year old African American and Puerto Rican student entrusted to his and KIPP DC's educational authority. Those circumstances existed within pronounced and overlapping disparities of age, gender, race, ethnically, tribal identity, institutional authority and adult control. Perez alleges that the racial and dimensions of that power relationship also carry historical significance in the United States, where the vulnerability, sexual exploitation, and diminished institutional protection of African American and Puerto Rican citizens cannot be divorced from the broader historical legacy of racial hierarchy, colonialism, and unequal protection. Perez alleges that this

context further underscores why responsibility for maintaining appropriate boundaries rested with Coleaman and the adults and institution entrusted with her protection- not with the fourteen-year-old child subjected to his conduct. Perez further alleges that the behaviors described above are material not because each individual act, viewed in isolation, formed an observable pattern relevant to what KIPP DC knew and how a responsible educational institution should have understood and responded to their information.

283. KIPP DC's knowledge was not limited to its observations of Coleman's conduct toward Perez. As alleged above, KIPP DC personnel also received complaints and expressions of concern concerning Coleman's conduct toward other female students, including reports from parents regarding inappropriate communications, access, and boundary violations. These included a parent's complaint concerning Coleman's communication with a female student about whether she was sexually active; another parent's refusal to permit her daughter to continue serving as Coleman's student aide; and another parent's intervention concerning her daughter's placement with Coleman. Perez alleges that these reports are material not because the experiences of other students were identical to hers, but because they provided KIPP DC with independent information concerning Coleman's pattern of disregarding appropriate adult-teacher boundaries with adolescent female students. Considered together with the conduct toward Perez described above, these independent warnings materially informed what KIPP DC knew, or had been expressly placed on notice of, concerning Coleman before the more serious events subsequently reported to the institution.

284. By 2007, the information available to KIPP DC had become substantially more serious. Perez's mother communicated directly with KIPP DC personnel concerning Perez's disappearance and reported that Coleman, KIPP DC's former teacher, had taken or kidnapped her minor daughter. As alleged above, that information was received by Sarah Hayes Campbell and communicated to Susan Schaeffler, thereby placing identifiable KIPP DC personnel in the chain of actual notice concerning Perez's disappearance and Coleman's involvement. Perez alleges that KIPP DC therefore possessed direct information concerning Coleman's alleged kidnapping or removal of Perez no later than 2007, and that this information did not arise in isolation but against the preexisting body of observations, complaints, parental concerns, and boundary violations concerning Coleman described above.

285. Perez alleges that KIPP DC's contemporaneous response further demonstrates the materiality of that information and supports an inference that responsible KIPP DC personnel understood that the circumstances required institutional attention. As alleged above, KIPP DC personnel communicated concerning Perez and Coleman, communicated with Perez's mother, and remained involved in matters concerning Perez's educational placement following her departure from Madeira. Perez further alleges that communications occurred between KIPP DC leadership and personnel associated with Madeira concerning Perez during the period in which concerns regarding Coleman's fixation on Perez were developing at Madeira.

286. The materiality of KIPP DC's historical knowledge is further demonstrated by the subsequent governmental investigation. As alleged above, MPD and the Office of the Attorney General for the District of Columbia investigated circumstances concerning institutional knowledge and reporting relating to Coleman, including the conduct and knowledge of KIPP DC personnel Susan Schaeffler and Karen Dresden and whether failures to report suspected abuse warranted criminal charges. Perez alleges that the governmental investigation concerned historical information materially overlapping with the institutional knowledge later placed at issue in the underlying litigation.

287. Notwithstanding that body of contemporaneous information, Perez alleges that KIPP DC subsequently made, adopted, maintained, or supplied materially narrower representations concerning what KIPP DC and its personnel knew about Coleman, when they knew it, what complaints or warnings they had received, and how the institution responded. Perez, alleges that those subsequent representations did not merely characterize disputed evidence differently, but affirmative described KIPP DC's historical knowledge and response while omitting information known to kIPP DC that materially altered the account presented.

288. The alleged omitted or materially narrowed information included, among other matters alleged above: contemporaneous observations of Coleman's interactions with Perez; complaints and concerns involving Coleman's conduct toward female students; communications from parents concerning Coleman's boundaries with students; Perez mother's 2007 report concerning Coleman's kidnapping of Perez; communications among KIPP DC personnel concerning Perez and Coleman; communications with other educational institutions concerning Perez; information subsequently examined by government investigators concerning KIPP DC personnel's historical knowledge and

reporting obligations; and historical insurance and notice information capable of providing contemporaneous evidence concerning what KIPP DC knew, reported, or presented at particular times.

289. Perez does not allege that KIPP DC was required in every circumstance voluntarily to disclose every historical fact in its possession. Rather, Perez alleges that when KIPP DC undertook to describe its historical knowledge, institutional response, discovery record, or other subjects addressed herein, it could not knowingly make affirmative representations or partial disclosures that omitted material information necessary to prevent the account actually presented from being false or misleading. Perez alleges that KIPP DC knew the materially broader historical facts because the underlying reports, observations, communications, institutional actions, and records involved KIPP DC itself and its responsible personnel.

**B. Continuation Through the Underlying Litigation**

290. KIPP DC's historical knowledge and institutional response became central factual issues in the underlying litigation, including whether KIPP DC had notice of Coleman's conduct, what complaints or warnings it received, what its personnel observed or knew, what actions it took in response, and whether information concerning those matters existed in contemporaneous institutional, governmental, or insurance records.

291. KIPP DC possessed substantially greater access than Perez to its historical institutional records, current and former personnel, internal communications, electronically stored information, insurance and broker relationships, communications with governmental authorities, and information concerning its own historical response to Coleman. Perez and her then-counsel therefore necessarily depended in material part upon KIPP DC's disclosures, discovery responses, document productions, designated corporate testimony, and testimony from KIPP DC personnel to develop the factual record concerning matters principally within KIPP DC's possession or knowledge.

292. During discovery, KIPP DC made affirmative disclosures and discovery responses, produced documents, designated or presented witnesses, and supplied factual information concerning its historical knowledge and institutional conduct. Perez alleges that she and her then-counsel proceeded on the understanding that KIPP DC's affirmative discovery representations and productions accurately identified and disclosed responsive

information to the extent required by the Federal Rules and KIPP DC's discovery obligations, and used that record in conducting depositions. developing evidentiary theories, providing materials to retained experts, and preparing the case for dispositive and pretrial proceedings.

293. Perez alleges that KIPP DC subsequently learned, knew, or possessed information demonstrating that qualifying prior disclosures or discovery responses were materially incomplete or incorrect but failed timely to correct or supplement them to the extend required by Rule 26(e). Perez does not allege that every discovery disagreement or subsequently identified document constitutes fraud. Rather, the alleged fraud concerns knowing material misrepresentations and omissions in affirmative representations or disclosures upon which Perez and her counsel relied in constructing the evidentiary record, together with failures to correct or supplement qualifying representations after their material incompleteness or incorrectness became known.

294. The extent and consequences of the alleged incompleteness became substantially more apparent after Perez assumed responsibility for her own representation in August 2025 and independently compared KIPP DC's discovery responses and productions with deposition testimony, governmental-investigation materials, institutional records, historical insurance information, witness evidence, and other portions of the record. That review identified alleged contradictions and omissions bearing upon KIPP DC's historical notice and institutional response and further revealed that portions of Perez's expert evidence had been developed using the discovery and deposition record assembled before those deficiencies were identified. Perez's vocational expert, for example, expressly identified deposition transcripts and discovery responses among the materials reviewed in developing her opinions.

295. After identifying those alleged deficiencies Perez repeatedly placed KIPP DC on notice, sought correction or supplementation, challenged allegedly contradictory deposition testimony and incomplete productions, and sought further factual and evidentiary development. Perez further alleges that the consequences now extend beyond the discovery process itself: the alleged incomplete predicate record informed portions of the expert record; KIPP DC and Capital City subsequently moved to exclude Perez's experts; and, in their August 27, 2026 Joint Opposition to Perez's request to hold those motions temporarily in abeyance, Defendants expressly represented that their fully brief summary-judgment motions are "partially dependent on the Court's rulings on their

expert motions." Perez alleges that this sequence demonstrates the continuing material effect of the predicate factual record upon expert evidence, damages analysis, dispositive proceedings, and her ability to litigate the underlying litigation on a complete and accurate evidentiary foundation.

**C. Historical Insurance and Notice Information**

296. KIPP DC's historical insurance and notice records provide a specific category of information both relevant to the alleged misrepresentations and omissions and to independently contemporaneous evidence concerning KIPP DC's historical knowledge. Insurance applications, policies, notices of circumstances or claims, tenders, loss histories, broker communications, insurer communications, and related records may reflect what kIPP DC knew concerning Coleman and Perez, when it acquired that knowledge, and what KIPP DC represented to insurers or brothers concerning the same historical events.

297. During discovery in the underlying litigation, Perez sought insurance agreements and related information concerning periods relevant to Coleman's conduct. KIPP DC's institutional knowledge and response, and potential coverage for the claims asserted by Perez.

298. In responding to Perez's requests concerning historical insurance, KIPP DC affirmatively represented that it had produced "all insurance agreements that are required to be disclosed under Rule 26," which KIPP DC described as those policies under which an insurer "may be liable to satisfy all or part of a possible judgment" in the underlying litigation or to indemnify or reimburse payments made to satisfy such a judgment. KIPP DC thereby represented not merely what documents it had produced, but that the production encompassed the universe of insurance agreements that KIPP DC maintained were subject to disclosure under Rule 26(a)(1)(A)(iv).

299. After Perez continued to question the completeness of KIPP DC's historical insurance production and specifically pursued policies covering the period of Coleman's employment and the conduct alleged in the underlying litigation, KIPP DC subsequently produced additional 2004-2005 Hartford Educators Legal Liability and Umbrella Liability policies that had not been included in the production encompassed by its earlier presentation.

300. In producing those additional policies, KIPP DC expressly stated that it had not been obligated to provide them because, in KIPP DC's view, they did not provide coverage for the underlying litigation due to sexual-abuse exclusions. KIPP DC thus did not contend that the policies had been nonexistent or unavailable; rather, it explained their earlier nonproduction by asserting its own substantive conclusion that the policies could not provide coverage for Perez's claims.

301. Perez alleges that this sequence demonstrates that KIPP DC screened existing historical insurance agreements according to its own substantive assessment of coverage before determining which agreements to disclose, and that its earlier representation that it had produced all insurance agreements required by Rule 26 therefore incorporated KIPP DC's undisclosed coverage determination concerning the withheld historical policies.

a. Perez does not allege that KIPP DC's coverage interpretation, standing alone, constitutes fraud, nor does she allege that every dispute concerning the scope of insurance discovery is independently actionable as fraud. Rather, the historical insurance allegations are material to Count I insofar as KIPP DC made affirmative representations concerning the existence, scope, completeness, or applicability of historical insurance information while possessing materially broader information concerning the same subject, or insofar as the undisclosed insurance records contain contemporaneous evidence bearing upon the truth or falsity of KIPP DC's representations concerning its historical knowledge and notice.

302. Perez disputes KIPP DC's determination that the existence of an exclusion permitted it categorically to without the policies from disclosure and further alleges that the subsequent production is material to whether KIPP DC's earlier insurance disclosures and representations were complete and accurate when made. Perez further alleges that the later production disclosed the existence of contemporaneous insurance agreements whose applications, underwriting materials, notices, claims histories, communications, and related records may independently bear upon KIPP DC's historical knowledge and representations concerning Coleman and the event underlying Perez's claims.

303. The historical insurance record is material independently of the potential availability of proceeds to satisfy a judgment. Applications, notices of circumstances, claims histories, loss information, tenders, broker and insurer communications, and related

underwriting records may contain contemporaneous evidence of what KIPP DC knew concerning Coleman, when it acquired that knowledge, and what it represented concerning that knowledge. The existence, absence, continuation, modification, or nonrenewal of coverage is likewise material to determining whether KIPP DC's insurance decisions and representations were consistent with its contemporaneous knowledge. Perez specifically seeks such insurance, underwriting, and broker records for the 2005–2009 policy periods, encompassing the period during which Perez alleges KIPP DC possessed continuing institutional notice concerning Coleman and his conduct, which records have not presently been produced to Perez.

304. As alleged in the preceding factual allegations, comparison of KIPP DC's contemporaneous institutional and third-party witnesses, representations to governmental authorities, insurance and broker records to the extent obtained, discovery disclosures and responses, and subsequent litigation positions provides a means of determining whether materially inconsistent accounts of the same historical facts were knowingly maintained. Perez alleges that material inconsistencies among those sources support her contention that the omissions and narrowing alleged in this Count were knowing rather than inadvertent.

a. To the extent Perez relies upon a particular insurance-related representation as an actionable misrepresentation under Count I, Perez relies upon the specific representation, speaker or responding party, communication or discovery response, approximate date, subject matter, and alleged omitted or contradictory information identified in the incorporated factual allegations. Perez does not rely upon the mere existence of additional insurance policies as a substitute for pleading the circumstances of the alleged fraud.

**D. Knowledge and Falsity**

305. Perez alleges that KIPP DC knew the material facts, alleged to have been misrepresented, materially narrowed, or omitted because those facts arose from events personally observed by KIPP DC personnel; complaints, observed by KIPP DC personnel; complaints, warnings and parental interventions communicated directly to KIPP DC or its responsible administrators; communications among KIPP DC personnel concerning Coleman and Perez; Perez's mother in 2007 report that her minor daughter was missing and had been taken by Coleman; communications involving Hayes-Campbell, Schaeffler, Coleman, and Perez's mother concerning Perez's whereabouts; subsequent communications concerning Perez after she left KIPP DC;

KIPP DC's own institutional and insurance records; and information acquired through governmental investigation and years of litigation concerning the same historical events.

a. Perez further alleges that the relevant knowledge was possessed by identifiable KIPP DC institutional actors, including Schaeffler and Hayes-Campbell, who personally observed , received, participated in, or were subsequently informed of material events concerning Coleman and Perez. As alleged above, the 2007 sequence in particular involved communications through which Perez's mother's report concerning Perez's disappearance and Coleman's involvement was received and transmitted among KIPP DC personnel.

b. Perez alleges that KIPP DC's knowledge must be evaluated cumulatively. Information concerning Coleman's conduct toward Perez was received against a preexisting body of observations, complaints, warnings, and parental interventions concerning Coleman's conduct toward Perez and other minor female students. Perez therefore alleges that later information concerning her disappearance, Coleman's involvement, and his continuing access to her did not reach KIPP DC in an information vacuum.

306. Perez further alleges that KIPP DC knew the contents of its own affirmative representations, discovery disclosures and responses, institutional testimony, and other communications made or adopted on its behalf, and knew whether those representations omitted or materially narrowed information already possessed by KIPP DC concerning the subjects addressed. Where the representation concerned KIPP DC's own historical knowledge, communications, institutional response, or records, Perez alleges that KIPP DC was positioned to know whether the resulting account accurately reflected the information actually possessed by the institution and its responsible personnel.

a. Perez further alleges that materially inconsistent accounts concerning the same historical events-including differences between subsequent deposition testimony and contemporaneous or independently corroborating evidence concerning what Schaeffler, Hayes-Campbell, and other KIPP DC personnel observed, received, communicated or knew-support an inference that the alleged narrowing or omission of material information was knowing rather than the product of an innocent difference in recollection.

307. Perez alleges that the subsequent emergence of sworn third-party accounts, governmental-investigation materials, historical institutional and insurance information, and other evidence materially broader than or inconsistent with KIPP DC's earlier representations and disclosures further supports an inference that the alleged

incompleteness was knowing rather than inadvertent. That inference is strengthened where subsequently obtained evidence concerns events allegedly known personally to the same institutional actors whose later accounts materially omitted, narrowed, or contradicted those events.

a. Consistent with Federal Rule of Civil Procedure 9(b), Perez alleges the circumstances constituting the fraud with particularity as set forth herein and in the incorporated factual allegations. Perez alleges KIPP DC's knowledge, intent, malice, and other conditions of mind generally, while further pleading the foregoing factual circumstances from which knowledge and intent may reasonably be inferred.
b. Perez alleges that knowledge and intent may further be inferred from KIPP DC's continued institutional involvement concerning Perez after her departure from KIPP DC; Schaeffler's subsequent communications concerning Perez and her education; the transmission of information concerning Perez's disappearance and Coleman's involvement; KIPP DC's later acquisition of information through governmental investigation; and the repeated significance of the same historical facts during subsequent civil, discovery, and litigation proceedings.

308. Perez alleges that the repeated omission, narrowing, or materially inconsistent treatment of substantially the same historical information across institutional communications, governmental proceedings, discovery, sworn testimony, insurance-related matters, and subsequent litigation supports an inference of knowledge and intent rather than isolated mistake, inadvertence, failed recollection, or innocent recordkeeping error. Perez further alleges that the cumulative sequence-including contemporaneous notice, subsequent governmental scrutiny, later litigation concerning the same events, and express notice from Perez identifying asserted contradictions and omissions-supports an inference that KIPP DC knew when subjects were materially incomplete or inconsistent with information already with its knowledge.

a. To the extent KIPP DC or its responsible personnel deliberately avoided confirming, reviewing, preserving, or reconciling information concerning Coleman and Perez despite possessing information that made the significance of those matters apparent, Perez alleges that such deliberate avoidance further support the such deliberate avoidance further supports the inference of knowledge and intent alleged herein. Perez does not rely upon negligence, failure to investigate, or constructive notice alone to establish fraudulent
b. Perez does not rely upon generalized allegations of corporate knowledge divorced from identifiable events or institutional actors. The knowledge events in this Count derives from the particular observations, complaints, reports, communications, records, governmental proceedings, and subsequent

representations identified above and in the incorporated factual allegations, including information personally received or possessed by Schaeffler, Hayes-Campbell, and other KIPP DC personnel acting within the scope of their institutional roles.

**E. Intent to Induce Reliance**

309. Perez alleges that KIPP DC made the foregoing representations and omissions with the intent that Perez and her then-counsel receive and act upon the factual record KIPP DC presented concerning its historical knowledge of Coleman, prior complaints and warnings, its institutional response, relevant records and communications, and historical insurance information, and that those representations be used in conducting discovery, examining witnesses, developing expert evidence, evaluating damages and settlement, briefing dispositive and evidentiary issues, and otherwise prosecuted the underlying litigation.

a. Perez does not allege that the adversarial relationship required her to accept KIPP DC's legal arguments, disputed characterizations, or advocacy as true. Rather, she alleges that when KIPP DC undertook through formal discovery responses, disclosures, document productions, and sworn institutional testimony to provide factual information uniquely or substantially within its possession, KIPP DC intended those representations to function as the factual disclosures upon which the opposing party and the litigation process would proceed unless contradicted or supplemented by other evidence.

310. Perez alleges that KIPP DC intended the alleged misrepresentations and material omissions to affect the factual record developed in the underlying litigation by narrowing the information available concerning KIPP DC's historical knowledge and notice, limiting the factual predicates available for deposition questioning and other discovery, affecting the information supplied to retained experts, and influencing evaluation of liability, causation, damages, settlement dispositive motions, and subsequent evidentiary proceedings.

a. Perez further alleges that these were natural and foreseeable uses of the information KIPP DC supplied because discovery responses, document productions, and sworn testimony, concerning institutional knowledge and historical events were obtained for the purpose of developing the evidentiary record upon which later stages of the litigation would necessarily depend.

311. Perez alleges that KIPP DC's intent to induce such reliance may be inferred from the nature and context of the representations; KIPP DC's superior or exclusive access to substantial portions of the historical institutional and insurance record; the materiality of the subjects addressed; the formal discovery and sworn-testimony mechanisms through which the information was provided; and the foreseeable use of that information by Perez, her counsel, retained experts, and the court in developing and adjudicated the underlying litigation. Perez alleges intent and other conditions of mind generally pursuant to Rule 9(b).

a. Perez does not predicate fraudulent intent merely upon KIPP DC's pursuit of litigation positions adverse to her, its denial of liability, or its advocacy concerning disputed facts. The intent alleged in this Count concerns KIPP DC's alleged knowing presentation or omission of material factual record be used and acted upon in the continued prosecution and adjudication of the underlying litigation.

**F. Actual and Reasonable Reliance**

312. Perez actually relied upon KIPP DC's affirmative factual representations, discovery disclosures and responses, document productions, and sworn institutional testimony in prosecuting the underlying litigation. Before discovering the alleged material inconsistencies and omissions described herein, Perez and her then-counsel proceeded through discovery upon the factual record presented by KIPP DC concerning its historical knowledge of Coleman, prior complaints and warnings, institutional communications and response, relevant records, and insurance information.

a. The reliance affected the manner in which discovery was conducted, the information available for deposition preparation and questioning, the evidence available to evaluate KIPP DC's historical notice and institutional response, the information supplied or available to retained experts, the development of damages and causation theories, and Perez's evaluation of the evidentiary and settlement posture of the underlying litigation.

313. Perez's reliance upon KIPP DC's formal factual disclosures was reasonable because substantial portions of the relevant historical information concerned KIPP DC's own institutional knowledge, internal communications, personnel, records, electronically stored information, insurance history and response to events occurring within or involving the institution and therefore were uniquely or substantially more accessible to KIPP DC than to Perez.

a. Perez does not allege that she reasonably relied upon KIPP DC's legal arguments, denials of liability, disputed characterizations of evidence, or other ordinary

adversarial advocacy. Her reliance concerned factual information provided through formal discovery mechanisms and sworn testimony concerning matters within the personal or institutional knowledge of KIPP DC and its witnesses.

314. Perez further relied upon KIPP DC's discovery representations because the Federal Rules contemplate truthful, complete, and timely discovery disclosures and responses and impose continuing obligations to correct or supplement certain materially incomplete or incorrect information. Perez alleges that she was entitled, absent information placing her on notice to the contrary, to use KIPP DC's formal factual disclosures and sworn testimony in developing the evidentiary record without assuming that material information responsive to the subjects addressed had knowingly been withheld, materially narrowed, or misrepresented.

315. The effects of that reliance extended into expert development. Perez's retained experts reviewed and formulated opinions from the evidentiary record developed during discovery, including deposition testimony, discovery responses, records, and other case materials. As alleged above, Perez's vocational expert expressly reviewed deposition testimony and discovery materials in formulating opinions and concerning Perez's vocational impairment and loss of earning capacity.

a. Perez does not allege that every expert opinion was necessarily incorrect merely because portions of the underlying factual record later became disputed. Rather, she alleges that once she discovered material information allegedly omitted from or inconsistent with portions of that predicate record, she could no longer responsibly determine the completeness, accuracy, or necessary scope of supplementation of the resulting expert analyses without first addressing the underlying factual deficiencies.
b. The problem became particularly material when Perez undertook renewed analysis of damages and discovered that reliable valuation required her to determine whether expert opinions concerning causation, vocational loss, and related injury had been formulated from materially accurate factual predicates. Perez alleges that the unresolved discovery deficiencies therefore impaired her ability to formulate and evaluate a reliable damages theory and settlement position.

316. Perez does not allege that she was wholly unaware of every discovery deficiency while represented by counsel. She became aware during the underlying litigation that

certain discovery issues and deficiencies existed and raised concerns regarding aspects of the record. Perez alleges, however, that she reasonably relied upon her retained counsel to investigate, pursue, and remedy those issues and did not then possess or appreciate the full body of information necessary to identify the scope, interrelationship, and downstream consequences of the alleged misrepresentations and omissions described herein.

a. Perez subsequently concluded that her former counsel had not adequately pursued or corrected material discovery issues and that counsel's litigation positions had, in material respects, aligned with or failed adequately to challenge positions advanced by KIPP DC. Prez ultimately terminated that representation and assumed responsibility for prosecuting the underlying litigation pro se. The adequacy of former counsel's representation is the subject of separate litigation and is alleged here only insofar as it bears upon the timing and reasonableness of Perez's discovery of the alleged fraud and her subsequent efforts to mitigate its effects.

b. Perez further alleges that the significance of the positions taken by her former counsel became more apparent after counsel subsequently joined with KIPP DC in the present declaratory-judgment litigation on issues adverse to Perez. Perez alleges that this subsequent alignment informed her reassessment of whether discovery deficiencies she had previously raised had been adequately investigated or pursued during counsel's representation. Perez does not rely upon that joinder, standing alone, as proof of KIPP DC's fraud.

317. After assuming responsibility for the underlying litigation pro se in August 2025, Perez independently reviewed the discovery record, deposition testimony, institutional and governmental materials, insurance information, sworn third-party accounts, expert materials, and other evidence. As the alleged inconsistencies and omissions became apparent, Perez ceased relying upon the earlier factual record as complete and undertook efforts to investigate, correct, supplement, and preserve the affected issues.

a. Those efforts included motions seeking sanctions or additional deposition relief concerning allegedly inconsistent testimony; requests concerning incomplete insurance disclosures and historical policies; efforts to obtain and preserve additional institutional and governmental information; and, after renewed review of the expert record, Perez's August 2026 request that the pending motions in limine be held in abeyance while the predicate discovery and evidentiary issues remained unresolved.

b. Perez alleges reliance only for the period during which she proceeded upon the allegedly incomplete or misleading factual record without sufficient information to appreciate its material deficiencies. Once Perez discovered information

sufficient to place her on notice of the alleged falsity or incompleteness, she ceased such reliance and sought corrective relief. Conduct occurring thereafter is alleged as evidence of mitigation, notice, causation, and continuing consequences rather than as continued reliance upon representations Perez had already challenged.

c. To the extent material litigation decisions were made through Perez's retained counsel while counsel represented her, Perez alleges that she personally relied upon counsel to conduct discovery and prosecute her claims using accurate and complete information obtained through the discovery process, and that the resulting litigation decisions were made on Perez's behalf. Perez does not rely solely upon reliance by counsel, experts, or the Court as a substitute for her own reliance and resulting injury.

**G. Causation and Resulting Injury**

318. Perez alleges that KIPP DC's knowing material misrepresentations and willful omissions proximately caused injury by causing Prez and her then-counsel to investigate, develop, evaluate, and prosecute substantial portions of the underlying litigation upon a factual record that Perez alleges materially understated or omitted information concerning KIPP DC's historical knowledge, notice, institutional response, relevant records, and insurance history.

a. The resulting injury developed cumulatively. The alleged incomplete factual record affected the information available during discovery and deposition preparation; the resulting discovery record; expert analyses were thereafter formulated from that record; and later dispositive, damages, settlement, and evidentiary decisions necessarily proceeded against the factual and expert record that had been developed.

319. Perez alleges that the resulting injuries include the loss or impairment of opportunities to conduct discovery and examine witnesses with the benefit of material information allegedly withheld or misrepresented; the need to reinvestigate historical facts and records after discovery had substantially progressed or closed; the need to seek corrective, supplemental, sanctions, preservation, and evidentiary relief; impairment of the efficient development and evaluation of expert evidence; impairment of Perez's ability to formulate a reliable damages and settlement position; and other litigation consequences directly attributable to proceeding upon the allegedly incomplete factual record.

a. Perez further alleges that later discovery of material information did not necessarily restore her to the position she would have occupied when originally

required or represented. Depositions had already been taken, discovery strategy had already been formulated, expert development had occurred, and portions of the litigation had proceeded before Perez acquired information she alleges should have been available earlier.

b. In particular, Perez alleges that once she discovered material disputes concerning the factual predicates underlying portions of the expert record, she was required to reassess whether existing expert analyses remained complete, whether supplementation or further evaluation was necessary, and whether damages could responsibly be calculated from the record as then constituted. Those issues became especially consequential when the particles proceeded toward adjudication of motions concerning Perez's experts.

320. Perez further alleges that the delayed discovery of material information impaired her ability to use that information at the procedurally appropriate stage of the underlying litigation, including in document discovery, depositions, follow-up discovery, expert development, damages analysis, settlement evaluation, and damages analysis, settlement evaluation, and presentation of factual issues to the Court. Perez alleges that the value of material discovery information lies not merely in its eventual possession, but in its timely availability while corresponding procedural opportunities remain open.

a. The alleged injury likewise extends to historical insurance and notice information insofar as delayed or incomplete disclosure prevented Perez from timely investigating and potentially relevant policies, notices, broker and insurer communications, claims histories, and other contemporaneous records during the ordinary discovery period and from using any material information thereby revealed in related depositions, expert development, damages analysis, or litigation strategy.

321. Perez alleges that she incurred additional expenditures of time, effort, and resources in identifying, investigating, documenting, and attempting to remedy the alleged misrepresentations and omissions after substantial portions of the underlying litigation had already proceeded. Perez seeks recovery only for those damages legally recoverable as a proximate consequence of the fraud alleged in this Count and does not allege that every expense associated with prosecuting the underlying litigation constitutes fraud damages.

a. Perez alleges that the conduct of her former counsel does not eliminate causation attributable to KIPP DC insofar as KIPP DC first supplied, withheld, narrowed, or misrepresented material factual information upon which the litigation proceeded.

Perez separately alleges that former counsel failed adequately to identify or remedy certain resulting deficiencies, and she does not seek in this Count to attribute to KIPP DC injuries caused solely and independently by former counsel's conduct.

b. After discovering the alleged deficiencies, Perez undertook reasonable efforts to mitigate further injury by independently investigating the record, raising the alleged contradictions and omissions, seeking additional discovery or corrective relief where available, challenging alleged unreliable testimony, investigating historical insurance information, and seeking to preserve unresolved predicate issues before further adjudication of expert and evidentiary matters.

322. The injuries alleged in this Count are distinct from the personal injuries, emotional injuries, educational injuries, economic losses, and other harms caused by Coleman's original historical conduct, kidnapping, interstate transportation, exploitation, and abuse. Count I instead seeks relief for legally cognizable injuries proximately caused by KIPP DC's alleged subsequent fraud, including injury arising from Perez's reliance upon materially false or incomplete information in investigating, developing, valuing, and prosecuting the underlying litigation and the resulting loss, impairment, or duplication or litigation opportunities and resources.

a. Perez does not seek duplicative recovery for the same injury under multiple theories or proceedings. To the extent injuries alleged in this Count overlap with injuries attributable to other actors or causes of actions, Perez seeks only relief legally attributable to KIPP DC's alleged fraud and subject to the Court's allocation of causation and damages.

**H. Scope of the Underlying Tort**

323. Perez does not allege that every discovery dispute, incomplete production, adverse litigation position, disputed recollection, coverage disagreement, failure voluntarily to disclose information, or disagreement concerning the significance of historical evidence constitutes fraud. Nor does Perez predicate Count I merely upon KIPP DC's denial of liability or its pursuit of litigation positions adverse to Perez.

324. Count I is instead limited to specific circumstances in which Perez alleges that KIPP DC knowingly made an affirmative material misrepresentation, knowingly omitted material information while undertaking to address a subject in manner that rendered the resulting representation materially false or misleading, or failed to correct or supplement

a proper material representation after KIPP DC knew that the representation after KIPP DC knew that the representation was materially incomplete or inaccurate, with the intent that Perez act upon the resulting factual account.

a. The actionable subjects alleged in this Count include representations and material omissions concerning KIPP DC's historical knowledge and notice or Coleman's conduct toward Perez and other minor female students; contemporaneous complaints, warnings, observations, and parental interventions; the 2007 report concerning Perez's disappearance and alleged kidnapping or taking by Coleman and KIPP DC's institutional response thereto; subsequent governmental investigation concerning institutional reporting and response; material institutional records and communications; and historical insurance and notice information.

b. Perez alleges that the actionable fraud occurred when KIPP DC subsequently undertook to represent, disclose, describe, or provide factual information concerning those subjects and knowingly presented a materially false, narrowed or incomplete account upon which Perez was intended to and did act. The historical events concerning Coleman are therefore relevant to Count I principally because they establish the information against which the truth or falsity, materiality, knowledge, and intent associated with KIPP DC's subsequent representations and omissions may be evaluated.

325. Perez does not allege that KIPP DC's filing of motions, opposition to relief requested by Perez, examination of witnesses, legal arguments, settlement positions, or other ordinary acts of adversarial advocacy independently constitute the fraud allied herein. Such subsequent litigation conduct is alleged only where relevant to notice, reliance, causation, mitigation, continuation of the consequences of an earlier alleged misrepresentation or omission, or the context in which a specific independently actionable factual misrepresentation was made.

a. Likewise Count I does not attribute fraudulent intent to counsel merely because counsel advocated KIPP DC's interests or opposed Perez's requested relief. To the extent conduct or representations by counsel are relevant to Count I, Perez relies upon them only insofar as counsel communicated or maintained specific factual representations attributable to KIPP DC after KIPP DC possessed information allegedly establishing that those representations were materially false or incomplete, or insofar as counsel's conduct bears upon notice, causation, mitigation, or continuation or alleged injury.

326. Perez further alleges that the availability of discovery remedies, sanctions, supplementation, or other procedural relief in the underlying litigation does not itself define the substantive scope of Count I. Perez invokes those proceedings as part of the factual chronology and as evidence of notice, reliance, causation, mitigation, and resulting injury. The independent tort alleged here is KIPP DC's knowing material misrepresentation or willful omission of material fact, made with intent to induce Perez's reliance, followed by Perez's actual and reasonable reliance and resulting legally cognizable injury.

a. Perez does not ask this Court, through Count I, merely to review or reverse discovery rulings entered in the underlying litigation. Rather, she alleges an independent course of fraudulent conduct whose existence and resulting injury may be informed by evidence developed in that litigation, including the timing of disclosures, deposition testimony, subsequently discovered information, corrective motions, and unresolved disputes concerning the integrity and completeness of the factual record.

327. Accordingly, Perez alleges that KIPP DC knowingly made material misrepresentations and willful omissions concerning matters identified with particularity herein; knew that the resulting factual account was materially false, incomplete, or misleading; intended that Perez act upon that account in investigating, developing, valuing, and prosecuting the underlying litigation; caused Perez actually and reasonably to do so before discovering the alleged deficiencies; and thereby proximately caused the distinct injuries alleged above. Perez therefore seeks all compensatory, consequential, equitable, and other relief legally available for KIPP DC's fraud, together with punitive damages to the extent authorized by District of Columbia law and established by the evidence.

a. Perez has pleaded the circumstances constituting the alleged fraud with particularity by identifying the material subjects, communications and proceedings, approximate periods, information allegedly known but omitted or misrepresented, manner in which the representations were allegedly false or misleading, reliance, and resulting injury. Knowledge, intent, malice, and other conditions of mind are alleged generally as permitted by Federal Rule of Civil Procedure 9(b).

**WHEREFORE**

Counterclaim Plaintiff Perez respectfully requests that judgment be entered in her favor and against Counterclaim Defendant KIPP DC on Count I; that Perez be awarded compensatory and consequential damages in an amount established at trial; punitive damages to the extent

permitted by District of Columbia law and supported by the evidence; prejudgment and post-judgment interest as permitted by law; costs and other recoverable relief; and such other and further relief as the Court deems just and proper.

**COUNT II**

**AIDING AND ABETTING THE FRAUD ALLEGED IN COUNT I**

**Against Counterclaim Defendant Massachusetts Bay Insurance Company**

328. Counterclaim Plaintiff Perez incorporates by reference the preceding allegations of this Counterclaim as though fully set forth herein, including Count I and the allegations concerning the nexus among KIPP DC's historical institutional knowledge, the criminal investigation, the Underlying Litigation, the insurance record, and the subsequent coverage proceedings.

329. Perez brings this Count against Massachusetts Bay Insurance Company ("MBIC") for secondary liability arising from its alleged knowing and substantial assistance of the common-law fraud alleged against KIPP DC in Count I, under the aiding-and-abetting framework recognized in *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), to the extent such secondary liability is available under District of Columbia law.

330. Perez does not allege that MBIC is liable merely because it insured KIPP DC, investigated coverage, issued a reservation of rights, funded or participated in KIPP DC's defense, communicated with its insured or defense counsel, or sought a judicial determination concerning coverage.

331. Rather, Perez alleges that MBIC's secondary liability arises from assistance allegedly provided after MBIC acquired general awareness of its role in KIPP DC's continuing fraud and thereafter knowingly provided substantial assistance that facilitated, preserved, enabled, or encouraged continuation of the fraud alleged in Count I. Perez predicates liability upon MBIC's conduct during the continuation of that alleged fraud, not upon Coleman's underlying conduct or MBIC's ordinary performance of its contractual insurance obligations.

**A. The Underlying Tort**

332. As alleged in Count I, KIPP DC committed common-law fraud through knowing material misrepresentations and willful omissions concerning its historical knowledge of Coleman, complaints and warnings concerning Coleman, Perez's mother's 2007 kidnapping report, KIPP DC's institutional response, the governmental investigation of institutional reporting failures, historical insurance and notice information, and materially incomplete representations concerning those subjects during subsequent proceedings.

333. Perez alleges that KIPP DC's fraud caused independent injury by delaying Perez's discovery of material information, causing her to rely upon a materially incomplete factual record, impairing her ability to investigate and litigate her claims with complete information, and causing the consequential injuries alleged in Count I.

334. The fraud alleged in Count I constitutes the underlying tort upon which Perez predicates MBIC's secondary liability under this Count.

**B. MBIC's Developing Knowledge**

335. Perez alleges that MBIC's knowledge must be evaluated chronologically and cumulatively rather than inferred merely from MBIC's status as KIPP DC's insurer.

336. MBIC entered the relevant chronology after substantial events concerning Coleman, Perez, and KIPP DC had already occurred.

337. Before the 2017–2018 MBIC/Hanover policy period, substantial events concerning Coleman, Perez, and KIPP DC had already occurred. As alleged above, KIPP DC had received complaints and warnings concerning Coleman; Perez's mother had reported in 2007 that Perez had been kidnapped or taken by Coleman; Perez reported Coleman's conduct to MPD in April 2016; Coleman was apprehended in Florida in May 2016 with involvement of the United States Marshals Service; and governmental investigation concerning the underlying events and institutional response was underway.

338. During the relevant period, MPD also investigated a completed failure-to-report offense, and OAG investigated Susan Schaeffler and Karen Dresden and considered

potential criminal charges arising from institutional conduct associated with the same historical circumstances.

339. Perez does not presently allege, without access to MBIC's complete underwriting and claims files, that MBIC necessarily knew every one of those facts when it initially issued the policy.

340. Perez instead alleges that MBIC's knowledge developed as it received and evaluated information concerning claims arising from Coleman's conduct and KIPP DC's alleged institutional failures.

341. By 2018, MBIC had received notice of civil claims arising from the underlying circumstances and undertook or funded KIPP DC's defense subject to its coverage position.

342. MBIC thereafter continued its involvement when Perez commenced the Underlying Litigation in April 2021.

343. MBIC's involvement continued through the District Court proceedings, dismissal of Perez's claims, Perez's appeal to the United States Court of Appeals for the District of Columbia Circuit, reversal and remand, and subsequent factual development in the Underlying Litigation.

344. Perez alleges that MBIC consequently occupied a continuing position from which it received, reviewed, generated, or had access to information concerning the factual allegations against KIPP DC, KIPP DC's defenses, insurance coverage, historical notice, and developments in the litigation.

345. Perez alleges that the cumulative nature of that information is material. Facts that may not independently have disclosed the alleged fraud when first received could acquire

materially different significance when compared with subsequently obtained information concerning KIPP DC's historical knowledge, governmental investigations, discovery representations, and insurance history.

**C. General Awareness of the Overall Tortious Activity**

346. Perez alleges that, through its continuing claims-handling, coverage, and defense relationship with KIPP DC, MBIC accumulated information concerning both the historical circumstances underlying Perez's claims and KIPP DC's subsequent representations concerning its knowledge, institutional response, and insurance history. Perez alleges that the cumulative information eventually provided MBIC with general awareness that its continuing relationship with KIPP DC implicated the alleged fraud identified in Count I, rather than merely KIPP DC's potential liability for Coleman's historical misconduct.

347. Perez alleges that MBIC became generally aware that KIPP DC's historical knowledge of Coleman, prior complaints and warnings, institutional reporting and response, and the accuracy and completeness of KIPP DC's subsequent representations concerning those subjects were themselves disputed and material issues in the Underlying Litigation.

348. Perez further alleges that MBIC acquired information concerning KIPP DC's historical insurance relationships, the factual basis of Perez's claims, KIPP DC's litigation positions, and information developed during the Underlying Litigation that permitted MBIC to compare the historical circumstances with representations subsequently maintained concerning them.

349. Perez alleges that MBIC's general awareness may be inferred not from the mere existence of the insurer-insured relationship, but from the nature and accumulation of information MBIC received over years while defending, evaluating, and ultimately litigating coverage for claims arising from the same underlying factual nucleus.

350. The precise date and full circumstances under which MBIC acquired general awareness of its alleged role in KIPP DC's continuing tortious activity are not presently known to Perez because relevant claims files, coverage analyses, underwriting materials,

and nonprivileged communications concerning MBIC's knowledge and state of mind remain principally within Defendants' possession or control. Perez nevertheless alleges general awareness based upon the chronology, duration, informational access, and conduct identified herein.

**D. MBIC's Conduct After Acquiring Awareness**

351. Perez alleges that MBIC's liability depends upon what MBIC did after acquiring general awareness of the alleged tortious activity.

352. After acquiring substantial information concerning the underlying events and KIPP DC's historical knowledge and representations, MBIC continued providing financial, informational, coverage-related, and litigation assistance to KIPP DC. Perez does not allege that continuation of those activities, standing alone, constituted substantial assistance to fraud; rather, their significance depends upon MBIC's knowledge and whether particular assistance thereafter enabled KIPP DC to maintain the materially false or incomplete factual account alleged in Count I.

353. MBIC also possessed or generated its own underwriting, claims-handling, reservation-of-rights, coverage-analysis, and defense information potentially capable of corroborating, contradicting, or materially supplementing representations concerning KIPP DC's historical knowledge and insurance record.

354. Perez alleges that MBIC's continuing assistance became potentially tortious when information available to MBIC allegedly disclosed material discrepancies between the historical and insurance record and representations being maintained by KIPP DC, and MBIC thereafter knowingly furnished assistance that substantially facilitated the maintenance or continuation of those representations.

355. Perez alleges that MBIC thereafter remained an active participant in the financial, informational, coverage, and litigation relationship through which assistance continued to be furnished to KIPP DC. Perez predicates liability only upon assistance proven to have been knowingly directed toward, or to have substantially facilitated, continuation of the fraud alleged in Count I.

**E. Commencement of the Declaratory-Judgment Action During Discovery**

356. On November 5, 2024, MBIC affirmatively commenced this declaratory-judgment action concerning coverage for the Underlying Litigation.

357. MBIC commenced this action while factual development and discovery concerning KIPP DC's historical knowledge and institutional conduct remained ongoing in the Underlying Litigation.

358. By filing this action, MBIC moved beyond the internal evaluation of coverage and affirmatively sought judicial relief concerning the insurance consequences of the same historical circumstances then being developed through discovery in the Underlying Litigation.

359. During this overlapping period, MBIC and KIPP DC necessarily addressed coverage arising from the same underlying factual circumstances while KIPP DC remained subject to its own applicable disclosure, discovery-response, and supplementation obligations in the Underlying Litigation.

360. Perez alleges that the overlapping proceedings are relevant to nexus because MBIC's coverage evaluation concerned historical circumstances also material to representations and qualifying discovery responses being maintained by KIPP DC in the Underlying Litigation. Information obtained, generated, or evaluated through the coverage relationship could therefore bear directly upon whether those representations were materially incomplete or incorrect.

361. Perez does not allege that MBIC independently assumed KIPP DC's discovery obligations merely because it insured KIPP DC or commenced this action.

362. Perez alleges that secondary liability arises only to the extent MBIC possessed sufficient awareness that KIPP DC was maintaining materially false or incomplete representations, or failing to correct information KIPP DC was independently obligated

to correct, and MBIC thereafter knowingly furnished assistance that substantially enabled or facilitated continuation of that fraud. Perez does not predicate liability upon MBIC's commencement or prosecution of this declaratory-judgment action standing alone.

**F. Knowing Assistance**

363. Perez alleges that any actionable assistance was knowing because it occurred after MBIC had accumulated substantial information concerning the factual history, KIPP DC's institutional knowledge and defenses, the insurance record, and the disputed representations underlying the claims, and after that cumulative information allegedly provided MBIC general awareness of the fraud alleged in Count I.

364. Perez further alleges that MBIC's state of mind may be inferred from the information actually available to it, the duration and nature of its involvement, its repeated coverage evaluations, its communications concerning the underlying claims, and its conduct after receiving information allegedly inconsistent with materially incomplete representations maintained by KIPP DC.

365. Perez does not presently possess the complete nonprivileged communications between MBIC, KIPP DC, KIPP DC's defense counsel, coverage counsel, brokers, and other relevant persons.

366. Perez therefore does not allege the specific contents of communications she has not seen.

367. Perez alleges that the chronology and information presently known support the inference of general awareness described above. Factual development concerning Defendants' nonprivileged communications is additionally material to determining when MBIC acquired such awareness, what discrepancies it recognized between information available to it and representations maintained by KIPP DC, and what assistance MBIC thereafter knowingly provided.

368.

**G. Substantial Assistance**

369. Perez alleges that MBIC's assistance must be evaluated in context and cumulatively, including the nature of the conduct assisted, the amount and kind of assistance provided, MBIC's presence or absence in relation to the principal tort, MBIC's relationship with KIPP DC, MBIC's state of mind, and the duration of its involvement.

**1. Nature of the Act Assisted**

370. The conduct allegedly assisted was not Coleman's original abuse or kidnapping, which substantially predated MBIC's involvement.

371. The principal tort allegedly assisted was KIPP DC's subsequent fraud—the knowing maintenance of materially false or incomplete representations concerning institutional knowledge, response, reporting, insurance, and related information material to Perez's ability to investigate and litigate her claims.

372. Perez alleges that assistance knowingly enabling KIPP DC to preserve, reinforce, or continue the materially false or incomplete representations alleged in Count I would directly facilitate the underlying tort rather than merely provide ordinary assistance to an insured defending against historical liability.

**2. Amount and Kind of Assistance**

373. Perez alleges that MBIC's assistance was neither isolated nor momentary.

374. MBIC's relationship with KIPP DC extended over years and included defense funding or facilitation, coverage evaluation arising from the underlying events, receipt and evaluation of information concerning the claims and defenses, coverage-related decisionmaking, and ultimately separate federal litigation concerning the insurance consequences of those circumstances. Perez relies upon this course of conduct as context for evaluating the amount, duration, informational significance, and nature of any assistance proven to have been furnished after MBIC acquired general awareness of the alleged fraud.

375. Perez alleges that the significance of that assistance must be evaluated in light of MBIC's knowledge at the time each form of assistance was provided.

376. Perez does not allege that defense funding provided before MBIC acquired general awareness of the alleged fraud constitutes actionable assistance merely because that funding benefited KIPP DC.

**3. Presence**

377. MBIC was not present during Coleman's original conduct or KIPP DC's earliest alleged institutional failures, and Perez does not allege otherwise.

378. MBIC was, however, directly involved in the later insurance, coverage, defense, and litigation relationship during the period in which Perez alleges KIPP DC's fraud continued through materially false or incomplete representations and omissions.

379. Perez therefore predicates MBIC's secondary liability upon its alleged participation during the continuation of the tort, not upon events predating MBIC's involvement.

**4. Relationship to KIPP DC**

380. MBIC maintained a longstanding contractual, financial, claims-handling, coverage, and defense relationship with KIPP DC arising directly from the liabilities at issue in the Underlying Litigation.

381. That relationship provided MBIC with access to information concerning KIPP DC's claims, defenses, historical circumstances, and insurance positions and provided MBIC the ability to furnish financial and litigation assistance relevant to KIPP DC's defense.

382. Perez alleges that the relationship is probative not because an insurer-insured relationship is inherently suspicious, but because its duration, informational access, and continuing assistance are relevant to evaluating whether assistance furnished after MBIC acquired awareness of the alleged fraud was knowing and substantial.

**5. State of Mind**

383. Perez alleges that MBIC's state of mind may be inferred from the cumulative information available to it and its conduct after acquiring that information.

384. The relevant inquiry includes what MBIC learned through underwriting, claims handling, defense activity, appellate proceedings, discovery, coverage analysis, and communications with KIPP DC; whether that information disclosed material inconsistencies or omissions; and whether MBIC thereafter continued providing assistance that enabled KIPP DC to maintain the alleged fraud.

385. Perez alleges that assistance furnished after MBIC acquired increasingly specific information concerning KIPP DC's alleged fraud carries materially different significance from the same conduct undertaken without awareness of the underlying tort. Perez therefore predicates secondary liability upon the relationship between MBIC's state of mind at the relevant time and the assistance thereafter furnished.

**6. Duration**

386. MBIC's relationship with and assistance to KIPP DC extended across multiple years and multiple stages of litigation.

387. Perez alleges that duration is material because repeated assistance furnished over years while MBIC accumulated information concerning the underlying circumstances, KIPP DC's representations, and the insurance record may support a materially different inference from an isolated commercial transaction undertaken without knowledge of wrongdoing.

388. Perez alleges that the length of MBIC's involvement also increased its access to information concerning the alleged fraud and afforded repeated opportunities to reassess the nature of the conduct its assistance was facilitating.

**H. Nexus Between the Assistance and the Underlying Fraud**

389. Perez alleges that MBIC's actionable assistance was connected to the underlying fraud because the information, representations, insurance history, and institutional

knowledge implicated in MBIC's coverage and defense relationship materially overlapped with the subjects of KIPP DC's alleged fraud in Count I.

390. The same historical information concerning KIPP DC's knowledge of Coleman, institutional response, governmental investigation, insurance history, and subsequent representations was relevant both to KIPP DC's liability in the Underlying Litigation and to MBIC's evaluation and litigation of coverage.

391. Perez alleges that MBIC's position afforded it access to information capable of revealing material discrepancies between KIPP DC's historical knowledge and insurance record and representations KIPP DC subsequently maintained concerning those same circumstances.

392. The relevant nexus is not merely that MBIC provided money to KIPP DC or defended an insured accused of wrongdoing.

393. The relevant nexus is whether, after becoming generally aware of KIPP DC's alleged fraud, MBIC knowingly used its financial, informational, litigation, or coverage relationship with KIPP DC in a manner that substantially enabled, facilitated, preserved, or encouraged continuation of that fraud.

394. Perez alleges that the chronology and cumulative circumstances identified above—including MBIC's developing knowledge, duration of involvement, informational access, relationship with KIPP DC, continuing assistance, and involvement in overlapping coverage proceedings—support a plausible inference that MBIC knowingly furnished substantial assistance to continuation of the fraud alleged in Count I. Perez does not rely upon any one circumstance in isolation, and does not allege that ordinary insurance, defense, or coverage activity constitutes substantial assistance absent the requisite knowledge and nexus to the underlying tort.

**I. Causation and Liability**

395. Perez alleges that MBIC's knowing and substantial assistance facilitated the continuation of the fraud alleged in Count I and contributed to the resulting information asymmetry and delay in Perez's discovery of material facts.

396. Perez alleges that the injuries caused by continuation of the fraud were a foreseeable consequence of knowingly and substantially assisting conduct that allegedly caused Perez to proceed upon a materially incomplete factual record and delayed her discovery and use of material information.

397. Perez seeks to hold MBIC secondarily liable only for injuries legally attributable to the underlying tortious conduct MBIC knowingly and substantially assisted.

398. Perez does not seek through this Count to impose aiding-and-abetting liability upon MBIC for ordinary insurance or litigation activities undertaken without the requisite knowledge of the underlying tort.

399. Upon proof that MBIC acquired general awareness of its role in KIPP DC's overall tortious activity and thereafter knowingly provided substantial assistance to the fraud alleged in Count I, Perez alleges that MBIC is subject, to the extent recognized by applicable District of Columbia law, to secondary liability for injuries proximately resulting from the fraud it knowingly and substantially assisted.

**WHEREFORE**, Counterclaim Plaintiff Perez respectfully requests that judgment be entered in her favor and against Counterclaim Defendant Massachusetts Bay Insurance Company on Count II to the extent aiding-and-abetting liability is recognized and established under applicable District of Columbia law; that MBIC be held secondarily liable for damages proximately resulting from the fraud it knowingly and substantially assisted; that Perez be awarded compensatory and consequential damages in an amount established at trial; punitive damages to the extent permitted by District of Columbia law and supported by the evidence; prejudgment and post-judgment interest as permitted by law; costs and other recoverable relief; and such other and further relief as the Court deems just and proper.

**COUNT III**

**CIVIL CONSPIRACY TO COMMIT AND FURTHER THE FRAUD ALLEGED IN COUNT ONE**

**Against Counterclaim Defendants KIPP DC and Massachusetts Bay Insurance Company**

400. Counterclaim Plaintiff Perez incorporates by reference the preceding allegations of this Counterclaim as though fully set forth herein, including Count I and the factual allegations concerning the nexus among KIPP DC's historical institutional knowledge, the criminal investigation, the Underlying Litigation, the insurance record, MBIC's developing knowledge, and the overlapping coverage proceedings.

401. Perez brings this Count against KIPP DC and Massachusetts Bay Insurance Company ("MBIC") for civil-conspiracy liability arising from the common-law fraud alleged in Count I.

402. Perez does not plead civil conspiracy as an independent tort. The underlying tort is KIPP DC's alleged common-law fraud through material misrepresentations and willful omissions, as specifically alleged in Count I.

403. Perez alleges that KIPP DC and MBIC reached an express or tacit understanding to act in concert concerning the maintenance, advancement, or preservation of materially incomplete representations concerning facts material to KIPP DC's historical knowledge, institutional response, insurance history, and potential liability and that overt acts undertaken pursuant to that understanding furthered the fraud alleged in Count I and caused injury to Perez.

## A. Underlying Tortious Conduct

404. As alleged in Count I, KIPP DC knowingly made material misrepresentations and willfully omitted material facts concerning, among other matters, prior complaints and warnings regarding Coleman; KIPP DC's historical knowledge concerning Coleman's conduct toward Perez; Perez's mother's 2007 report that Perez had been kidnapped by Coleman; KIPP DC's institutional response; governmental investigation of institutional

reporting failures; historical insurance and notice information; and subsequent representations concerning those subjects.

405. Perez alleges that those misrepresentations and omissions caused her to rely upon a materially incomplete factual record and proximately caused the independent injuries alleged in Count I.

406. The fraud alleged in Count I supplies the underlying tortious act necessary for the civil-conspiracy liability alleged herein.

## B. Formation and Nature of the Alleged Agreement

407. Perez alleges that the agreement between KIPP DC and MBIC need not have been memorialized in a written agreement expressly identifying an unlawful objective.

408. Perez alleges that the existence and scope of the agreement may be inferred from the parties' communications, coordinated conduct, respective knowledge, continuing relationship, the information available to each Defendant, and the sequence and timing of their conduct concerning the same underlying factual information.

409. Perez does not allege that the insurance contract itself constitutes the conspiratorial agreement.

410. Nor does Perez allege that MBIC's agreement to defend KIPP DC, standing alone, establishes an agreement to participate in fraud.

411. Perez alleges that the relevant agreement arose only after MBIC acquired sufficient information concerning KIPP DC's historical knowledge and the allegedly materially false or incomplete factual account to understand the nature of the fraud alleged in Count I. Perez does not allege a conspiratorial agreement predating MBIC's acquisition of such knowledge.

412. Perez alleges that, after MBIC acquired such knowledge, KIPP DC and MBIC continued communicating and coordinating concerning KIPP DC's defense, coverage, historical insurance information, and the same factual circumstances material to Perez's claims. Perez relies upon such post-knowledge coordination only insofar as the surrounding circumstances support an inference that the parties were acting pursuant to a common understanding to further the fraud alleged in Count I.

413. Perez further alleges that the parties' interests became aligned in material respects. KIPP DC sought to defeat or limit liability in the Underlying Litigation, while MBIC possessed a financial interest in determining, limiting, or eliminating insurance obligations arising from that liability.

414. Perez does not allege that aligned financial interests alone establish conspiracy. Perez alleges that those interests provide relevant context for evaluating the parties' subsequent coordinated conduct after MBIC allegedly acquired knowledge of the fraud.

## C. Circumstantial Evidence of Agreement

415. Perez alleges that the existence of the agreement is supported by the cumulative circumstances alleged herein rather than any single isolated act.

416. First, MBIC maintained a multi-year defense, claims-handling, and coverage relationship with KIPP DC concerning substantially the same historical conduct and institutional allegations.

417. Second, through that relationship MBIC accumulated information concerning Perez's allegations, KIPP DC's historical knowledge, KIPP DC's defenses, prior and existing insurance coverage, and the factual developments occurring in the Underlying Litigation.

418. Third, MBIC continued communicating and interacting with KIPP DC concerning defense and coverage after the Underlying Litigation placed KIPP DC's historical knowledge and institutional response directly at issue.

419. Fourth, on November 5, 2024, MBIC commenced the present declaratory-judgment action while discovery and factual development concerning the same historical circumstances remained ongoing in the Underlying Litigation. Perez alleges this fact as part of the chronology and informational context and not as an independently unlawful or conspiratorial act.

420. Fifth, the declaratory-judgment action required MBIC to evaluate insurance coverage arising from historical circumstances simultaneously material to the Underlying Litigation, while KIPP DC continued addressing those circumstances in its defense and discovery obligations. The resulting temporal and factual overlap is alleged as relevant to the information available to the parties and their subsequent conduct.

421. Sixth, Perez alleges that additional historical insurance information subsequently became known or was acknowledged while KIPP DC continued maintaining that its prior insurance disclosures were sufficient and later declined Perez's requests for additional supplementation.

422. Seventh, Perez alleges that MBIC possessed or generated underwriting, claims-handling, coverage, reservation-of-rights, and defense information capable of bearing upon the completeness or accuracy of representations concerning KIPP DC's historical insurance and notice record.

423. Perez alleges that the cumulative circumstances identified in ¶¶417–423, considered together rather than in isolation, support an inference that, after MBIC acquired the requisite knowledge, KIPP DC and MBIC acted pursuant to a tacit understanding concerning continuation or advancement of the materially false or incomplete factual account alleged in Count I. Perez alleges the existence of that understanding from the presently known chronology and conduct; nonprivileged communications and other

evidence within Defendants' possession may further establish its formation, scope, and implementation.

424. Perez does not allege that parallel conduct, a contractual relationship, aligned litigation interests, or ordinary insurer-insured communications independently establish an agreement. Rather, Perez alleges that the cumulative post-knowledge conduct described above, viewed in context with the parties' continuing informational relationship and conduct concerning the same allegedly false or incomplete factual account, supports the inference of a tacit understanding.

### D. Common Objective

425. Perez alleges that the common objective of the conspiracy was to maintain, preserve, or advance the materially false or incomplete factual account alleged in Count I concerning KIPP DC's historical knowledge, institutional response, insurance history, and related matters material to Perez's claims, thereby impairing Perez's ability to discover and act upon a complete and accurate factual record.

426. Perez alleges that continuation of the materially incomplete factual account was capable of advancing distinct interests of both Defendants: KIPP DC's interest in defending against liability in the Underlying Litigation and MBIC's interest in evaluating and litigating its coverage obligations. Perez does not allege that those interests were themselves unlawful; their relevance is limited to motive and context for the alleged agreement and subsequent conduct.

427. The alleged common objective did not require KIPP DC and MBIC to possess identical motives or derive identical benefits from the conspiracy.

428. Perez alleges that the relevant agreement was an understanding to participate in or further the same unlawful course of conduct, notwithstanding that KIPP DC and MBIC may have possessed distinct financial, litigation, or coverage motivations for doing so.

### E. Overt Acts in Furtherance of the Agreement

429. Perez alleges that KIPP DC and MBIC committed or caused overt acts in furtherance of the alleged common scheme.

430. Perez alleges that overt acts undertaken pursuant to and in furtherance of the alleged agreement include, to the extent established by the incorporated factual allegations and subsequent proof:

a. KIPP DC's maintenance of materially false or incomplete representations concerning its historical knowledge of Coleman and institutional response;
b. KIPP DC's omission or material narrowing of information concerning prior complaints and warnings, Perez's mother's 2007 kidnapping report, and governmental investigation of institutional reporting failures;
c. KIPP DC's materially incomplete representations or disclosures concerning its historical insurance and notice record;
d. KIPP DC's continued maintenance of qualifying representations after information allegedly demonstrating their material falsity or incompleteness became known;
e. KIPP DC's failure to correct or supplement qualifying prior disclosures or discovery responses after Perez identified asserted deficiencies, to the extent an applicable legal obligation required correction or supplementation;
f. assistance knowingly furnished by MBIC after acquiring the requisite awareness of KIPP DC's alleged fraud, to the extent such assistance substantially facilitated the maintenance or continuation of the fraud alleged in Count I; and
g. any communications or coordinated conduct proven to have occurred after the alleged agreement was formed and undertaken pursuant to and in furtherance of the fraud alleged in Count I.
h. Perez does not allege that ordinary communications, defense funding, coverage activity, litigation advocacy, or commencement or prosecution of this declaratory-judgment action constitutes an unlawful overt act merely because Defendants engaged in such conduct.

431. Perez does not allege that MBIC's commencement or prosecution of this declaratory-judgment action is itself unlawful, conspiratorial, or an independently actionable overt act. The existence and timing of this proceeding are alleged only as part of the chronology and informational context relevant to Defendants' knowledge, relationship, communications, and other conduct.

432. Likewise, Perez does not allege that lawful defense funding, coverage communications, or litigation advocacy become unlawful merely because KIPP DC and MBIC engaged in them.

433. Such otherwise lawful conduct is relevant only insofar as it provides evidence of the alleged agreement, knowledge, intent, or context, or insofar as independently actionable conduct undertaken pursuant to the agreement furthered the fraud alleged in Count I.

### F. The Overlapping Litigation as Evidence of Concerted Conduct

434. The temporal and factual overlap between the Underlying Litigation and the present declaratory-judgment action is relevant to the alleged conspiracy because the two proceedings required evaluation of substantially overlapping historical circumstances for different legal purposes.

435. In the Underlying Litigation, those facts bore upon KIPP DC's knowledge, institutional response, and liability to Perez.

436. In this action, those facts bore upon MBIC's obligations to defend, indemnify, reimburse, or otherwise provide coverage to KIPP DC.

437. Perez alleges that information developed or evaluated in either proceeding could therefore bear upon factual representations or positions concerning the same historical circumstances in the other.

438. During the period of overlap, KIPP DC remained responsible for its own discovery and supplementation obligations in the Underlying Litigation while simultaneously communicating with MBIC concerning coverage arising from the same facts.

439. Perez alleges that the post-knowledge chronology, overlapping subject matter, continuing communications, and conduct identified above support the alleged inference of agreement. Nonprivileged communications demonstrating that Defendants jointly

recognized material information contradicting or supplementing KIPP DC's representations and nevertheless agreed to maintain or facilitate materially false or incomplete representations would constitute additional evidence of the agreement and its implementation.

440. Relevant nonprivileged communications, coverage analyses, claims records, and other evidence concerning the formation, scope, or implementation of the alleged agreement remain principally within Defendants' possession or control. Perez does not purport to allege the specific contents of communications she has not seen.

## G. Knowledge and Intent

441. Perez alleges that KIPP DC possessed direct knowledge of its own historical institutional information, representations, omissions, discovery responses, and insurance disclosures. Perez further alleges that KIPP DC knowingly participated in the alleged conspiracy only to the extent it entered or acted pursuant to the agreement alleged herein with the purpose of maintaining or furthering the fraud alleged in Count I.

442. Perez alleges that MBIC knowingly joined or participated in the alleged conspiracy only after acquiring sufficient information through its continuing claims-handling, defense, coverage, and litigation activities to acquire general awareness of the fraud alleged in Count I, and thereafter knowingly acting pursuant to the alleged common understanding.

443. Perez further alleges that the Defendants' intent may be inferred from their respective knowledge, the duration and nature of their relationship, the accumulation of information over time, communications concerning the underlying circumstances, their subsequent conduct after acquiring contradictory or corrective information, and overt acts allegedly undertaken to preserve or advance the materially incomplete account.

444. Perez does not attribute KIPP DC's knowledge automatically to MBIC or MBIC's knowledge automatically to KIPP DC.

445. Rather, Perez alleges that each Defendant's knowledge and intent must be established individually and that the agreement may be inferred where the evidence demonstrates that the Defendants knowingly coordinated their conduct toward the alleged common objective.

### H. Nexus Between the Agreement and the Fraud

446. The alleged conspiracy is directly connected to the fraud in Count I because the object of the alleged agreement was the continuation or advancement of the materially incomplete representations and omissions constituting that underlying tort.

447. The same historical information concerning KIPP DC's knowledge of Coleman, prior complaints and warnings, the 2007 kidnapping report, institutional response, governmental investigation, historical insurance, and subsequent disclosures formed the factual nucleus of both the underlying fraud and the alleged conspiratorial conduct.

448. Perez therefore does not rely upon unrelated acts, mere association, or generalized allegations of wrongdoing to establish the conspiracy.

449. Perez alleges a specific relationship among the underlying tort, the alleged agreement, the overt acts, and the resulting injury: KIPP DC allegedly maintained the materially false or incomplete factual account identified in Count I; MBIC thereafter allegedly acquired the requisite awareness of that fraud; KIPP DC and MBIC allegedly reached an express or tacit understanding to maintain or further that fraud; independently actionable overt acts were undertaken pursuant to and in furtherance of that understanding; and continuation of the underlying fraud thereby caused additional injury to Perez.

### I. Injury Caused by Overt Acts in Furtherance of the Common Scheme

450. Perez alleges that overt acts undertaken pursuant to and in furtherance of the conspiracy caused the continuation of the fraud alleged in Count I and prolonged the resulting information asymmetry.

451. As a result, Perez continued litigating without material information allegedly necessary to investigate KIPP DC's historical knowledge, test institutional

representations, investigate historical insurance and notice, identify relevant witnesses and records, and litigate her claims upon a complete factual record.

452. Perez alleges that the conspiracy thereby caused or contributed to the injuries alleged in Count I, including delayed discovery and use of material facts, impairment of available investigative and litigation opportunities, duplication of efforts reasonably undertaken to identify and address the allegedly concealed or misrepresented information, and other legally cognizable consequential injury proximately resulting from the underlying fraud.

453. Perez seeks conspiracy liability only for injuries caused by an actionable overt tortious act performed pursuant to and in furtherance of the alleged agreement.

### J. Scope of Conspiratorial Liability

454. Perez alleges that, upon proof of the agreement, underlying fraud, overt acts in furtherance thereof, and resulting injury, each participant in the conspiracy is subject to liability for the underlying tortious conduct attributable to the conspiracy to the extent provided by District of Columbia law.

455. Perez does not seek to impose conspiracy liability merely because KIPP DC and MBIC maintained a contractual relationship, shared litigation interests, communicated concerning coverage, or engaged in lawful parallel conduct.

456. The conspiracy alleged herein depends upon proof that KIPP DC and MBIC reached an express or tacit understanding to participate in or further the fraud alleged in Count I and that an unlawful overt act undertaken pursuant to that understanding caused injury to Perez.

457. Perez alleges that the cumulative circumstantial facts identified herein support a reasonable inference of the express or tacit agreement alleged above. Further factual development concerning nonprivileged communications and other evidence principally within Defendants' possession may establish additional details concerning the

agreement's formation, scope, participants, duration, implementation, and acts undertaken in furtherance thereof.

**WHEREFORE**, Counterclaim Plaintiff Perez respectfully requests that judgment be entered in her favor and against Counterclaim Defendants KIPP DC and Massachusetts Bay Insurance Company on Count III; that Defendants be held liable to the extent permitted by District of Columbia law for legally cognizable injuries proximately caused by the underlying fraud and independently actionable overt tortious acts committed pursuant to and in furtherance of the conspiracy; that Perez be awarded compensatory and consequential damages in an amount established at trial; punitive damages to the extent permitted by District of Columbia law and supported by the evidence; prejudgment and post-judgment interest as permitted by law; costs and other recoverable relief; and such other and further relief as the Court deems just and proper.

## COUNT IV

## FRAUDULENT CONCEALMENT

### And, Alternatively, Fraudulent Concealment as a Basis for Tolling

### Against Counterclaim Cross Defendant KIPP DC

458. Counterclaim Plaintiff Perez incorporates by reference all preceding allegations of this Counterclaim as though fully set forth herein.

459. Perez invokes KIPP DC's fraudulent concealment as an equitable basis for tolling otherwise applicable limitations periods concerning claims whose factual basis KIPP DC allegedly prevented Perez from discovering through the acts, omissions, partial disclosures, and affirmative misleading conduct alleged herein.

460. Perez does not plead fraudulent concealment in this Count as a freestanding underlying tort separate from the fraud alleged in Count I. Rather, the substantive fraud alleged in Count I remains independently actionable, while the concealment alleged herein is pleaded for the distinct purpose of establishing equitable tolling to the extent any Defendant asserts that an otherwise viable claim accrued before Perez reasonably could have discovered the material facts necessary to identify it.

461. Perez alleges that KIPP DC engaged in affirmative misleading or deceptive conduct designed to prevent or delay discovery of material facts underlying such claims and that, notwithstanding Perez's exercise of reasonable diligence, the alleged concealment prevented her from discovering material portions of the factual basis of those claims during the period of concealment.

## A. Material Facts Concealed

462. As alleged above, KIPP DC possessed material information concerning Coleman and Perez dating to the period during which Coleman was employed as Perez's teacher and Perez was a minor.

463. That information included complaints and warnings concerning Coleman's conduct toward Perez and other minor female students, observations concerning Coleman's boundary violations and unusual access to Perez, and circumstances bearing upon KIPP DC's knowledge of the adult teacher's conduct toward Perez while she was a minor.

464. In 2007, Perez's mother specifically informed KIPP DC that her minor daughter had been kidnapped by Coleman and sought institutional intervention concerning KIPP DC's former employee.

465. Perez alleges that the 2007 report was materially different from information merely suggesting an inappropriate teacher-student relationship. A parental report that a former KIPP DC teacher had kidnapped a minor former student placed KIPP DC on notice of circumstances bearing directly upon the seriousness of Coleman's conduct, Perez's continuing vulnerability, KIPP DC's prior institutional response, reporting obligations, and potential institutional responsibility.

466. Perez further alleges that material information concerning KIPP DC's institutional knowledge and response subsequently became relevant to governmental investigation.

467. As alleged above, MPD investigated a completed failure-to-report offense arising from the underlying circumstances, and OAG subsequently investigated Susan Schaeffler and Karen Dresden and considered potential criminal charges concerning institutional conduct.

468. By January 2018, OAG Criminal Section Chief Peter Saba communicated with Perez concerning that investigation and advised her that attorneys representing Schaeffler and Dresden had communicated or met with OAG concerning potential charges.

469. Perez alleges that KIPP DC and responsible institutional personnel consequently possessed, received, or had direct access to information concerning KIPP DC's historical knowledge and the governmental scrutiny of its institutional response that was materially broader than the account subsequently represented or made available to Perez.

## B. Concealment of the Institutional and Governmental Record

470. Perez alleges that KIPP DC thereafter made affirmative representations or partial disclosures that materially narrowed its historical knowledge and institutional response, omitted material information necessary to prevent those representations from being misleading, and, where applicable, failed to correct qualifying representations after learning that they were materially incomplete or inaccurate.

a. The concealed information included, as alleged with greater specificity in the incorporated factual allegations:
b. prior complaints and warnings concerning Coleman and Perez;
c. Coleman's conduct toward Perez while Perez was a minor;
d. Perez's mother's 2007 report that Perez had been kidnapped by Coleman;
e. KIPP DC's response to the 2007 kidnapping report;
f. communications concerning institutional knowledge of Coleman;
g. information concerning governmental investigation of institutional failures to report suspected sexual abuse;
h. nonprivileged communications involving KIPP DC personnel or representatives and governmental investigators concerning the underlying circumstances;
i. information bearing upon representations made during the criminal investigation concerning what institutional actors knew and when;
j. historical insurance and notice information capable of independently memorializing what KIPP DC knew or reported concerning Coleman; and

k. other contemporaneous information identified in the preceding factual allegations bearing upon the accuracy of KIPP DC's subsequent account of its historical knowledge and conduct.

471. Perez alleges that the concealment must be evaluated cumulatively because no single omitted document or statement necessarily disclosed the full scope of the alleged wrongdoing.

472. Perez alleges that the alleged concealment was made more difficult to discover because material information was dispersed across institutional records, governmental-investigation materials, historical insurance records, communications involving institutional personnel, and later civil-litigation records, while KIPP DC's allegedly incomplete representations did not disclose the material relationship among those bodies of information.

**C. KIPP DC's Duty to Disclose Material Information**

473. Perez alleges that KIPP DC had duties to disclose particular material information at multiple points arising from the circumstances alleged herein.

474. Perez does not allege that KIPP DC possessed a limitless obligation voluntarily to disclose every fact concerning itself or Coleman.

475. Rather, Perez alleges particular duties to disclose arising where KIPP DC undertook to speak concerning a material subject and was required not to render the resulting representation materially false or misleading through omission; where applicable law imposed particular disclosure or reporting obligations; and, subsequently, where formal litigation obligations required truthful disclosures and responses and correction or supplementation to the extent required by applicable procedural rules.

476. Once KIPP DC affirmatively represented the nature and extent of its historical knowledge, institutional response, insurance history, or information responsive to particular discovery requests, Perez alleges that KIPP DC could not knowingly omit

material facts necessary to prevent the resulting representations from being materially misleading.

477. During the Underlying Litigation, additional duties arose from KIPP DC's applicable formal discovery obligations concerning information responsive to properly propounded discovery and from applicable obligations to correct or supplement qualifying disclosures or responses that KIPP DC learned were materially incomplete or incorrect.

478. Perez alleges that KIPP DC's superior or exclusive access to substantial portions of the allegedly concealed information is material to whether Perez reasonably relied upon KIPP DC's qualifying factual representations and whether reasonable diligence would independently have disclosed the omitted information.

**D. Historical Insurance as Concealed Evidence of Institutional Knowledge**

479. Perez alleges that KIPP DC's historical insurance record provides a concrete example of information allegedly withheld or materially narrowed and illustrates the relationship between the alleged concealment and contemporaneous evidence of institutional knowledge.

480. Perez requested insurance information concerning periods relevant to the underlying events and KIPP DC's potential liability.

481. KIPP DC produced or identified policies that it maintained were applicable to Perez's claims.

482. Perez subsequently learned that additional historical Hartford occurrence policies existed that had not been produced to her.

483. When Perez sought those additional policies, KIPP DC did not deny their existence but maintained that they were not required to be produced because, according to KIPP DC, they did not apply to Perez's claims.

484. Perez alleges that this position materially restricted her access not merely to potential sources of insurance proceeds, but to historical insurance records capable of independently establishing contemporaneous institutional knowledge and notice.

485. Such records may include insurance applications, notices of circumstances, claims histories, loss information, communications with brokers, tenders, insurer correspondence, underwriting information, and other records reflecting what KIPP DC represented to insurers concerning Coleman or related institutional circumstances.

486. Perez alleges that contemporaneous insurance representations and records are material because comparison of what KIPP DC communicated to insurers with what it subsequently represented to Perez, governmental investigators, and courts may corroborate or contradict KIPP DC's later account of its historical knowledge and notice. Perez does not allege the contents of insurance records she has not seen.

**E. Continuation of Concealment During the Underlying Litigation**

487. Perez commenced *Perez v. KIPP DC* in April 2021.

488. During the Underlying Litigation, KIPP DC's historical knowledge of Coleman and institutional response became directly material to Perez's claims.

489. Perez nevertheless alleges that material portions of the historical record responsive to qualifying discovery obligations remained undisclosed, materially narrowed, or reflected in representations that were materially incomplete during discovery.

490. Perez was represented by counsel during substantial portions of that period and reasonably relied upon her attorneys to conduct discovery and upon KIPP DC to comply with its applicable disclosure and discovery obligations.

491. Perez alleges that she did not possess the information necessary to recognize the full extent of the alleged omissions because the relevant facts were dispersed among institutional, governmental, insurance, and litigation records that she had not received and, in significant respects, did not know existed.

492. After Perez assumed responsibility for her own representation in August 2025, she began independently comparing deposition testimony, discovery responses, governmental records, historical insurance information, institutional records, and other information relating to the underlying events.

493. That comparison revealed information Perez alleges had not previously been disclosed to her and inconsistencies that were not apparent when the respective bodies of information were viewed separately

494. Perez thereafter notified KIPP DC of asserted deficiencies, requested additional information and supplementation, and continued investigating the historical record.

**F. Concealment During the Concurrent Coverage Proceedings**

495. The commencement of the present declaratory-judgment action on November 5, 2024 created an additional source of potentially relevant insurance and coverage information while factual development remained ongoing in the Underlying Litigation. Perez does not allege that MBIC's commencement or prosecution of the declaratory-judgment action itself constituted concealment by KIPP DC.

496. The coverage proceeding concerned insurance obligations arising from substantially the same historical circumstances that were then material to KIPP DC's liability in the Underlying Litigation.

497. The overlapping proceedings involved additional insurance and coverage information potentially bearing upon KIPP DC's historical knowledge, notice, insurance relationships, and prior representations.

498. Perez alleges that information developed or exchanged during the coverage proceedings could trigger KIPP DC's obligation to correct or supplement a qualifying prior disclosure or discovery response if that information demonstrated that the prior response was materially incomplete or incorrect.

499. Perez alleges that KIPP DC nevertheless continued resisting her requests for additional historical insurance information and supplementation after she identified the asserted deficiencies.

**G. Intent to Conceal and Deceive**

500. Perez alleges that KIPP DC's concealment was knowing and intentional.

501. Intent may be inferred from the materiality of the concealed information; KIPP DC's direct and superior access to that information; the repeated appearance of substantially the same omitted subjects across governmental, insurance, and civil proceedings; the duration of the alleged concealment; discrepancies between contemporaneous information and subsequent representations; and KIPP DC's continued maintenance of allegedly incomplete positions after Perez identified information calling their completeness into question.

502. Perez further alleges that the information concealed was not collateral or immaterial. It concerned the central disputed questions of what KIPP DC knew about Coleman, when it knew it, what it did after acquiring that knowledge, what it represented to governmental authorities and insurers, and whether those historical representations were consistent with positions subsequently maintained in civil litigation.

503. Perez alleges that the purpose and effect of the affirmative concealment and materially misleading partial representations described herein were to prevent or delay her discovery of the complete extent of KIPP DC's institutional knowledge, conduct, potential responsibility, and related evidence.

**H. Justifiable Reliance**

504. Perez alleges that, before discovering the asserted discrepancies, she actually and justifiably relied upon KIPP DC's affirmative representations, partial disclosures, formal discovery responses, productions, and qualifying sworn factual representations concerning matters for which KIPP DC possessed superior or exclusive access to the underlying information.

505. During formal discovery, Perez and her former counsel reasonably proceeded on the understanding that KIPP DC's qualifying discovery disclosures and responses complied with applicable discovery obligations and accurately identified responsive information to the extent required by those obligations, absent notice sufficient to reveal their alleged material incompleteness.

506. Perez alleges that reasonable diligence did not require her independently to discover material facts whose existence had allegedly been affirmatively concealed or materially obscured, particularly where relevant institutional, insurance, governmental, or litigation records were unavailable to her and principally or exclusively within the possession of others.

507. Perez consequently proceeded through portions of the Underlying Litigation without knowledge of material facts she alleges KIPP DC concealed.

508. Once Perez discovered information indicating that prior representations or disclosures were materially incomplete, she ceased relying upon those representations and undertook additional investigation and efforts to obtain supplementation.

**I. Injury Caused by the Concealment**

509. Perez alleges that KIPP DC's fraudulent concealment delayed her discovery of material evidence and caused her to investigate and litigate her claims upon a materially incomplete factual record.

510. The concealment impaired Perez's ability to identify relevant evidence and witnesses, formulate discovery requests with knowledge of the concealed information, examine witnesses concerning facts she did not yet know existed, investigate historical insurance and notice, compare contemporaneous institutional representations across different proceedings, and pursue potentially available legal remedies while evidence was more readily obtainable.

511. Perez further alleges that the concealment caused additional investigation, reconstruction, duplication of effort, and other consequential losses in identifying and addressing information she alleges should previously have been disclosed, for which she seeks recovery only to the extent legally cognizable and proximately caused by the alleged concealment.

512. Perez alleges that these injuries resulted from the concealment itself and are distinct from the injuries caused by Coleman's original conduct.

**J. Fraudulent Concealment and Tolling**

513. Separately and alternatively, Perez invokes fraudulent concealment as an equitable basis for tolling any otherwise applicable statute of limitations as to claims whose factual basis KIPP DC allegedly prevented her from discovering through the affirmative concealment alleged herein.

514. Perez alleges that KIPP DC engaged in affirmative misleading, deceptive, or otherwise contrived conduct designed to prevent or delay discovery of material facts concerning its historical knowledge, institutional response, governmental-investigation history, insurance and notice information, and subsequent representations concerning those subjects.

515. Perez alleges that, notwithstanding reasonable diligence, she lacked sufficient notice of material portions of the concealed factual basis of the claims for which tolling is invoked because relevant information remained dispersed among institutional, governmental, insurance, professional, and litigation repositories inaccessible or unknown to her and because the affirmative concealment and materially incomplete

representations alleged herein obscured the significance and relationship of the information available to her.

516. Perez exercised diligence over the relevant period, including reporting the underlying conduct to governmental authorities, participating in criminal proceedings, pursuing civil litigation, engaging counsel, participating in discovery, seeking documentary evidence and testimony, and, after assuming responsibility for her representation, independently comparing records from multiple sources and seeking correction and supplementation when inconsistencies emerged.

517. Perez alleges that reasonable diligence did not require discovery of material information that KIPP DC allegedly took affirmative steps to conceal or materially obscure where the information remained principally or exclusively within the possession of KIPP DC or other institutional actors and the information otherwise available to Perez did not reasonably disclose the concealed factual basis of the particular claim.

518. Perez alleges that awareness of the original injury and of potential institutional responsibility did not necessarily disclose the separate facts allegedly concealed concerning KIPP DC's historical knowledge, its contemporaneous response, representations made during governmental proceedings, historical insurance and notice records, or materially inconsistent subsequent representations. Perez invokes tolling only as to claims for which those concealed facts were necessary to identify the particular factual basis of the claim and were not reasonably discoverable earlier through diligent investigation.

519. Perez therefore does not contend that concealment of one fact indefinitely tolled every potential claim arising from the underlying events. Rather, tolling is asserted claim by claim to the extent the allegedly concealed information prevented Perez, despite reasonable diligence, from discovering the factual basis necessary to identify the particular claim at issue.

520. Perez alleges that material portions of the alleged concealment became reasonably discoverable only as she obtained and compared previously separated bodies of evidence

and identified inconsistencies among institutional records, governmental-investigation materials, deposition testimony, insurance information, discovery responses, and subsequent communications.

521. Accordingly, to the extent any Defendant asserts that an otherwise viable claim accrued before Perez reasonably discovered the facts necessary to identify that particular claim, Perez alleges that the applicable limitations period was tolled for the period during which KIPP DC's fraudulent concealment prevented such discovery notwithstanding Perez's exercise of reasonable diligence.

**K. Rule 9(b) Particularity**

522. Perez pleads the circumstances of the alleged fraudulent concealment with particularity through the incorporated factual allegations identifying the relevant actors, periods, communications, proceedings, information concealed, representations made, discovery requests and responses, subsequently discovered information, and resulting injury.

523. The circumstances relevant to the alleged concealment span distinct periods identified above, including KIPP DC's receipt of complaints and warnings concerning Coleman; Perez's mother's 2007 kidnapping report; the 2016–2018 criminal and governmental investigations; representations concerning institutional knowledge and reporting during those proceedings; the Underlying Litigation commenced in April 2021; discovery and factual development following remand; the November 2024 commencement of the declaratory-judgment action as chronological and informational context; and Perez's subsequent discovery, comparison, correction, and supplementation efforts.

524. Perez alleges the matters presently known to her with particularity and does not purport to know the contents of communications or records that remain exclusively within Defendants' possession.

525. Perez alleges the presently known circumstances supporting fraudulent concealment with particularity. To the extent additional nonprivileged evidence concerning precise participants, communications, dates, or mechanisms remains uniquely within Defendants'

possession, factual development may further establish the scope and implementation of the concealment already alleged.

**L. Scope and Effect of Tolling**

526. Perez invokes fraudulent concealment under this Count solely as an equitable tolling doctrine and does not rely upon it as a freestanding underlying tort.

527. Nothing in this Count seeks duplicative recovery for the fraud alleged in Count I. The conduct alleged herein is relevant to whether otherwise applicable limitations periods were suspended during periods in which fraudulent concealment prevented Perez, notwithstanding reasonable diligence, from discovering the factual basis necessary to identify particular claims.

528. Tolling is asserted on a claim-specific basis and only for the period during which the requirements of fraudulent concealment are established as to the particular claim and factual basis at issue.

529. Perez respectfully requests that, to the extent any Defendant asserts a statute-of-limitations defense against an otherwise viable claim, the Court determine that the applicable limitations period was tolled during any period in which KIPP DC's fraudulent concealment prevented Perez, notwithstanding her exercise of reasonable diligence, from discovering the factual basis necessary to identify that particular claim, and grant such other equitable relief concerning limitations as the Court deems just and proper.

**WHEREFORE**, Counterclaim Plaintiff Perez respectfully requests that, to the extent any Defendant asserts a statute-of-limitations defense against an otherwise viable claim, the Court determine that the applicable limitations period was tolled during any period in which KIPP DC's fraudulent concealment prevented Perez, notwithstanding her exercise of reasonable diligence, from discovering the factual basis necessary to identify that particular claim, and grant such other equitable relief concerning limitations as the Court deems just and proper.

**COUNT V**
**DECLARATORY JUDGMENT**

**<u>28 U.S.C. §§ 2201–2202</u>**

**Against Massachusetts Bay Insurance Company and KIPP DC**

530. Counterclaim Plaintiff Shanique Perez ("Perez") incorporates by reference all preceding allegations of this Counterclaim as though fully set forth herein.

531. Perez seeks declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202 concerning the insurance-coverage controversy affirmatively placed before this Court by Massachusetts Bay Insurance Company ("MBIC"), including the proper chronology of claims, notice, governmental proceedings, prior knowledge, related claims, and other facts material to the interpretation and application of the insurance coverage upon which MBIC seeks declaratory relief.

532. An actual, substantial, and immediate controversy exists among MBIC, KIPP DC, and Perez concerning MBIC's obligations under the insurance policy or policies implicated by Perez's claims against KIPP DC and the factual predicates upon which MBIC and KIPP DC contend coverage attaches, is limited, or is excluded.

A. PEREZ'S INTEREST IN THE COVERAGE CONTROVERSY

533. MBIC commenced this declaratory-judgment action and named Perez as a Defendant because Perez is the underlying claimant whose claims against KIPP DC give rise to the coverage controversy MBIC asks this Court to adjudicate.

534. The coverage determination sought by MBIC therefore directly concerns insurance potentially available to defend against or satisfy liabilities asserted by Perez against KIPP DC and accordingly affects Perez's legally cognizable interest in the coverage controversy.

535. Perez's interest is concrete rather than hypothetical. Perez commenced the Underlying Litigation against KIPP DC and others in April 2021. Following dismissal and appeal, the United States Court of Appeals for the District of Columbia Circuit reversed the dismissal of claims and remanded the action for further proceedings.

536. MBIC thereafter continued providing or funding KIPP DC's defense in connection with Perez's claims.

537. On November 5, 2024, while factual development and discovery concerning the Underlying Litigation were ongoing, MBIC commenced this separate declaratory-judgment action concerning insurance coverage for those same claims.

538. MBIC thereby placed before this Court questions concerning the existence, scope, interpretation, and application of the insurance coverage implicated by liabilities asserted in the Underlying Litigation.

## B. THE COVERAGE ANALYSIS REQUIRES THE COMPLETE FACTUAL CHRONOLOGY

539. Perez alleges that the coverage controversy cannot properly be resolved by treating the filing date of her subsequent civil action as the beginning of the relevant chronology if the applicable policy language makes earlier claims, notice, knowledge, circumstances, related claims, or other events material to coverage.

540. The underlying circumstances generated complaints, reports, institutional communications, a criminal investigation, an arrest, governmental communications, an MPD failure-to-report investigation, prosecutorial review, and consideration of potential criminal charges years before Perez commenced the Underlying Litigation.

541. Those events may be material because the MBIC/Hanover insurance at issue includes claims-made coverage whose application depends upon the actual language of the insurance contract, including any applicable definitions and provisions concerning a "Claim," related claims, notice, prior knowledge, circumstances potentially giving rise to claims, and other coverage-triggering events or conditions.

542. Whether any particular event constituted a "Claim" must therefore be determined from the actual policy language applied to the actual historical record.

543. Perez does not allege that every historical complaint, governmental communication, or investigative event necessarily constituted a "Claim" within the technical meaning of the MBIC/Hanover policy.

544. Perez alleges instead that MBIC and KIPP DC cannot properly identify a later civil complaint as the first relevant Claim or coverage event without accounting for earlier

events that may satisfy or implicate the policy's definitions, notice provisions, related-claims provisions, prior-knowledge provisions, or other conditions.

## C. EARLY INSTITUTIONAL NOTICE AND THE 2007 REPORT

545. KIPP DC possessed knowledge of the underlying circumstances years before Perez commenced civil litigation.

546. Among other matters alleged above, Perez's mother reported to KIPP DC in or about 2007 that Perez had been kidnapped by Coleman.

547. That report followed earlier complaints, warnings , observations, and institutional concerns concerning Coleman's conduct toward Perez and other minor female students while Perez was a minor and Coleman was employed as her teacher.

548. The significance of those historical reports is not limited to the merits of Perez's underlying tort claims. They also bear upon when KIPP DC possessed knowledge of circumstances that could reasonably give rise to liability, what KIPP DC thereafter disclosed to insurers and brokers, and whether subsequent insurance applications, notices, or representations accurately described KIPP DC's prior knowledge.

## D. THE 2016 CRIMINAL INVESTIGATION AND CONTEMPORANEOUS INSTITUTIONAL COMMUNICATIONS

549. By May 2016, the circumstances underlying Perez's claims had resulted in a criminal investigation and Coleman's arrest.

550. Contemporaneous communications establish that KIPP DC's senior leadership received information concerning that investigation through communications involving the Metropolitan Police Department ("MPD") and the District of Columbia Public Charter School Board ("PCSB").

551. On May 11, 2016, MPD Commander Jacob Kishter circulated information concerning Coleman's arrest to senior MPD personnel, including then-Chief of Police Cathy Lanier.

552. The MPD communication stated that detectives from MPD's Youth and Family Services Division had announced an arrest in a First Degree Child Sexual Abuse case involving the sexual assault of a fourteen-year-old female, that the conduct occurred between 2004 and 2007 in multiple areas within the District of Columbia, and that

Coleman had been arrested in Gainesville, Florida by members of the United States Marshals Service.

553. The MPD communication expressly identified Coleman as a former teacher at KIPP DC Key Academy and Capital City Public Charter School.

554. The information was transmitted outside MPD before public release. On May 11, 2016, Diane Groomes of MPD forwarded the arrest information to Scott Pearson and Audrey Williams of PCSB with the notation, “Fyi - not public yet.”

555. On May 12, 2016, Pearson, then Executive Director of PCSB, forwarded the information directly to Susan Schaeffler of KIPP DC and Karen Dresden of Capital City Public Charter School.

556. Pearson informed Schaeffler and Dresden that PCSB personnel and its communications team were available if they wanted “any help with communications around this.”

557. Tomeika Bowden of PCSB subsequently informed Pearson, Schaeffler, and Dresden that she had contacted her counterpart at MPD and asked MPD to “keep us in the loop.”

558. Schaeffler responded that same morning, “Appreciate the support. Katie Cole will be reaching out to you soon.”

559. These contemporaneous communications establish that, no later than May 2016, senior KIPP DC personnel possessed actual knowledge that Coleman had been arrested in connection with a criminal investigation concerning alleged sexual abuse of a fourteen-year-old female during a period in which he had been employed by KIPP DC and Capital City.

560. The communications further establish that nonpublic information concerning the investigation moved from MPD to PCSB and thereafter directly to senior personnel at KIPP DC and Capital City, and that PCSB offered communications assistance concerning the matter and sought continuing information from MPD.

561. Perez does not allege that the existence of these communications, standing alone, establishes unlawful conduct by MPD, PCSB, or KIPP DC. Their significance here is that they provide contemporaneous documentary evidence of KIPP DC’s institutional knowledge of the criminal investigation and of communications concerning that investigation years before Perez commenced the Underlying Litigation.

E. THE FAILURE-TO-REPORT INVESTIGATION AND PROSECUTORIAL REVIEW

562. The governmental investigation thereafter extended to alleged institutional failures to report sexual abuse.

563. MPD Public Incident Report CCN/Event No. 16191177, dated November 9, 2016, identifies Perez as the victim and records the offense "Failure To Make A Report–Sexual Abuse," under D.C. Code § 4-1321.02(e).

564. The MPD report identifies the recorded offense status as "COMPLETED," rather than attempted, and identifies, among the locations associated with the recorded matter, Capital City Public Charter School.

565. Perez does not allege that the MPD incident report, standing alone, establishes that Susan Schaeffler or Karen Dresden had been formally criminally charged. The report does establish that MPD formally recorded completed failure-to-report offenses arising from the circumstances underlying Perez's sexual-abuse allegations.

566. Subsequent governmental correspondence specifically identified Schaeffler and Dresden in connection with prosecutorial review concerning potential criminal charges..

567. An April 17, 2017 correspondence from the District of Columbia Office of the Attorney General ("OAG") is expressly captioned "In Re: DC v. KAREN DRESDEN & SUSAN SCHAEFFLER ETTINGER."

568. The April 17, 2017 correspondence states that OAG had reviewed "the file in this case and all available evidence at this time" and had "elected not to file charges in this case."

569. The correspondence further instructed that, if additional evidence became available, the assigned Assistant Attorney General should be contacted.

570. The April 2017 correspondence therefore reflects that OAG reviewed a file and available evidence concerning Dresden and Schaeffler for purposes of determining whether charges should be filed and elected at that time not to file charges.

F. SUBSEQUENT CONSIDERATION OF POTENTIAL CHARGES DURING THE 2017–2018 POLICY PERIOD

571. The presently available record further demonstrates prosecutorial activity concerning Schaeffler and Dresden after the April 2017 declination.

572. On January 19, 2018, during the July 1, 2017 through July 1, 2018 MBIC/Hanover policy period, Peter Saba, then Chief of OAG's Criminal Section, informed Perez in writing that he had sent both Susan Schaeffler and Karen Dresden letters informing them of OAG's "investigation and potential charges."

573. Saba further informed Perez that attorneys for both Schaeffler and Dresden had contacted him in response to those letters.

574. Saba stated that he intended to meet separately with those attorneys on January 25, 2018 and that, based upon information gathered during those meetings, OAG would begin formulating its "final position on whether to charge or not."

575. The January 2018 communication postdates OAG's April 2017 written decision electing not to file charges.

576. The presently available documents therefore reflect both: (1) an April 2017 prosecutorial decision declining charges after review of a file concerning Schaeffler and Dresden; and (2) subsequent prosecutorial activity in January 2018 in which OAG again communicated concerning potential charges against those same institutional actors and communicated with their attorneys concerning the charging determination.

577. The presently available record does not establish why OAG was considering potential charges in January 2018 following the April 2017 declination, whether the investigation had been reopened or continued, whether additional evidence had been obtained, whether a different offense or charging theory was under consideration, or what information was communicated during the January 2018 meetings with counsel.

578. Perez therefore does not plead a particular explanation for that sequence absent the complete governmental and related records.

579. The sequence is nevertheless material to this coverage controversy because the January 2018 governmental activity occurred during the MBIC/Hanover 2017–2018 policy period.

## G. MATERIALITY OF THE GOVERNMENTAL PROCEEDINGS TO THE DEFINITION OF "CLAIM"

580. MBIC and KIPP DC have treated the timing of a "Claim" as material to the operation of the claims-made coverage at issue.

581. The documentary chronology demonstrates that governmental proceedings concerning circumstances underlying Perez's claims occurred before Perez filed the subsequent civil action and, in certain instances, during the relevant policy period.

582. Of particular significance, during the 2017–2018 policy period OAG provided written notice to Schaeffler and Dresden of an investigation and "potential charges," their attorneys responded to OAG, and OAG scheduled separate meetings with those attorneys as part of its determination whether charges would issue.

583. Whether those written governmental notices, the governmental investigation, the prosecutorial proceedings, the involvement of defense counsel, or related communications constituted a "Claim" against an insured person depends upon the actual definition of "Claim" contained in the applicable insurance contract.

584. Alternatively, even if a particular governmental proceeding does not independently satisfy the policy's technical definition of "Claim," the same evidence may remain material to notice of circumstances, prior knowledge, related claims, reporting obligations, or other provisions of the applicable insurance contract.

585. Accordingly, Perez disputes any contention that the filing date of her subsequent civil complaint may be treated, without application of the actual policy language to the preceding documented chronology, as the first legally relevant coverage event.

## H. HISTORICAL OCCURRENCE COVERAGE AND THE COMPLETE INSURANCE RECORD

586. The broader coverage controversy also implicates the existence and potential relevance of insurance issued during earlier periods in which the underlying conduct allegedly occurred.

587. During discovery in the Underlying Litigation, Perez sought insurance agreements applicable to the historical period implicated by her allegations.

588. KIPP DC subsequently produced a Hartford policy providing occurrence-based coverage for the October 13, 2004 through October 13, 2005 policy period.

589. KIPP DC represented to Perez that the Hartford policy and the MBIC/Hanover policy it identified were the policies it maintained potentially provided coverage in relation to Perez's claims.

590. KIPP DC further represented that Hartford occurrence coverage turned upon when the alleged sexual abuse first occurred and that the 2004–2005 Hartford policy responded because Perez's complaint alleged that the abuse began during that policy period.

591. KIPP DC separately characterized the MBIC/Hanover coverage as "claims first made" coverage and represented that coverage under that policy turned upon when Perez first made her claims against KIPP DC.

592. Those positions demonstrate that the historical chronology performs different functions under the different insurance agreements: the occurrence policy turns upon the occurrence of covered conduct during a particular period, while the claims-made policy turns upon the contractual definition and timing of a Claim and associated notice requirements.

593. Perez alleges that the complete insurance record is material to identifying which insurance agreements potentially respond to which portions of the underlying allegations and to evaluating the respective coverage positions asserted in this action.

594. The existence and discoverability of historical insurance is analytically distinct from whether a particular insurer ultimately has a duty to defend or indemnify under a particular policy.

## I. CONCURRENT COVERAGE LITIGATION AND CONTINUING DISCLOSURE ISSUES

595. MBIC commenced this declaratory-judgment action on November 5, 2024 while discovery and factual development concerning the Underlying Litigation were ongoing.

596. At that time, MBIC was seeking adjudication of insurance rights arising from the same claims and historical events being developed in the Underlying Litigation.

597. The concurrent proceedings created overlapping factual issues concerning KIPP DC's historical knowledge, notice, insurance arrangements, governmental investigations, and communications concerning potential liability.

598. Perez alleges that Federal Rule of Civil Procedure 26(a)(1)(A)(iv) required disclosure in the Underlying Litigation of any insurance agreement under which an insurance business may be liable to satisfy all or part of a possible judgment in that action or to indemnify or reimburse payments made to satisfy such a judgment. Perez separately alleges that additional insurance, underwriting, notice, claims, or related information may be discoverable to the extent relevant and proportional under the generally applicable discovery rules.

599. Perez further alleges that applicable supplementation obligations under Federal Rule of Civil Procedure 26(e) are not necessarily extinguished merely because the scheduled discovery period has closed where a qualifying prior disclosure or discovery response is materially incomplete or incorrect and the additional or corrective information has not otherwise been made known during the discovery process or in writing.

600. Perez repeatedly sought additional insurance information and historical policies from KIPP DC.

601. KIPP DC took the position that policies outside those it identified as providing coverage were inapplicable or non-discoverable.

602. Perez disputes that position to the extent it conflates the ultimate legal question whether a particular policy affords coverage with the separate disclosure and discovery questions concerning the existence of insurance agreements and information material to the claims and defenses in the Underlying Litigation.

603. Perez alleges that information developed through the concurrent coverage controversy may bear upon the completeness and accuracy of the historical insurance and

notice record and upon any independently applicable correction or supplementation obligations in the Underlying Litigation.

J. DISPUTED LIABILITY FACTS MAY NOT BE SILENTLY CONVERTED INTO COVERAGE FACTS

604. Numerous facts bearing upon MBIC's requested coverage determination are simultaneously disputed issues in the Underlying Litigation.

605. Those disputed matters include, among other things, what KIPP DC knew concerning Coleman and when; what complaints and warnings KIPP DC received; what Perez's mother reported to KIPP DC; KIPP DC's response to those reports; the significance of the 2016 criminal investigation; the institutional failure-to-report investigation; the historical insurance record; and the timing and content of communications concerning potential liability.

606. Perez disputes any resolution of the coverage controversy that would treat KIPP DC's characterization of facts simultaneously disputed in the Underlying Litigation as established merely because KIPP DC advances that characterization in this coverage proceeding.

607. The purpose of this declaratory-judgment proceeding is to determine insurance rights and legal relations. It should not operate as a substitute proceeding for adjudicating disputed liability questions pending in the Underlying Litigation.

608. To the extent application of a coverage provision depends upon a historical fact simultaneously disputed and material in the Underlying Litigation, Perez alleges that the coverage determination should not presume that fact adversely to her merely from the litigation position of the insured whose underlying liability remains unresolved.

K. ACTUAL CONTROVERSY REQUIRING DECLARATORY RELIEF

609. The parties maintain concrete and adverse positions concerning the existence, scope, interpretation, timing, and application of insurance coverage to Perez's claims against KIPP DC.

610. MBIC seeks declaratory relief concerning its obligations arising from those claims.

611. KIPP DC seeks insurance protection with respect to liabilities asserted in the Underlying Litigation.

612. Perez is the underlying claimant whose claims and potential judgment are the subject of that coverage controversy and whom MBIC affirmatively named as a Defendant in this action.

613. The controversy therefore presents concrete questions concerning the parties' rights and legal relations under the insurance agreements at issue.

L. DECLARATIONS REQUESTED

614. Perez respectfully requests declarations, to the extent supported by the insurance contracts and evidentiary record, that:

a. the rights and obligations arising under the insurance coverage actually at issue must be determined according to the terms of the applicable insurance contract or contracts applied to the factual chronology material under those terms;
b. the filing date of Perez's subsequent civil action does not, standing alone, establish the date upon which every potentially relevant "Claim" was first made;
c. determination of when a "Claim" was first made requires application of the applicable policy definition to the events that preceded Perez's civil action, including governmental proceedings and written communications occurring before and during the relevant policy period;
d. to the extent implicated by applicable policy language, the coverage determination must account for documented events preceding and occurring during the relevant policy period, including the 2016 criminal investigation and institutional communications, the failure-to-report investigation and prosecutorial review, and the January 2018 governmental communications concerning investigation and potential charges;
e. whether the January 2018 governmental notices, investigation, prosecutorial proceedings, or related communications constituted a "Claim" against an insured person, notice of circumstances potentially giving rise to a Claim, a related Claim, prior knowledge, or another coverage-relevant event must be determined under the actual policy language and evidentiary record;
f. even if a particular governmental event does not independently satisfy the technical definition of "Claim," that event may nevertheless be considered to the extent relevant under provisions concerning prior knowledge, notice of circumstances, related claims, reporting obligations, or other policy conditions;

g. the existence and potential relevance of historical insurance cannot be rejected solely because KIPP DC or MBIC takes the litigation position that a particular policy ultimately does not afford coverage;

h. disputed facts concerning KIPP DC's underlying liability to Perez should not be treated as established adversely to Perez merely by accepting KIPP DC's characterization of those facts for purposes of this coverage proceeding;

i. any coverage determination dependent upon facts simultaneously disputed in the Underlying Litigation must preserve the distinction between adjudicating insurance rights and adjudicating KIPP DC's underlying liability to Perez;

j. the Court's coverage determination must account for the actual terms, definitions, exclusions, endorsements, conditions, notice requirements, related-claims provisions, prior-knowledge provisions, and coverage triggers contained in each insurance agreement properly determined to be at issue; and

k. such additional declarations concerning MBIC's obligations, KIPP DC's rights, Perez's legally cognizable interests, and the applicable insurance coverage as are established by the insurance contracts and evidentiary record.

M. FURTHER RELIEF

615. Pursuant to 28 U.S.C. § 2202, Perez further requests such additional relief based upon the declarations entered by this Court as is necessary or proper and legally available to Perez.

616. Perez does not seek through Count V to obtain a premature adjudication of KIPP DC's liability in the Underlying Litigation.

617. Nor does Perez ask the Court to infer from the presently available governmental documents the reason OAG declined prosecution in April 2017 or the reason potential charges were subsequently under consideration in January 2018 without development of the complete record.

618. Perez instead seeks adjudication of the actual insurance-coverage controversy according to the terms of the insurance contract or contracts properly at issue and the complete factual chronology material under those terms, including governmental and institutional events occurring before and during the relevant policy periods.

N. WAIVER AND ESTOPPEL AS TO COVERAGE DEFENSES

619. Perez alleges that MBIC's entitlement to assert particular coverage defenses must be determined in light of the complete chronology of MBIC's knowledge, its undertaking

and continuation of KIPP DC's defense, its coverage communications, the timing and content of its reservations of rights, and the particular coverage defenses MBIC subsequently asserted.

620. Under District of Columbia law, an insurer that undertakes an insured's defense without appropriately reserving a known coverage defense may waive, or under circumstances establishing the requisite prejudice may be estopped from asserting, that defense. Perez alleges that the existence of reservation language does not, standing alone, resolve whether MBIC timely and adequately preserved each particular coverage defense upon which it now relies.

621. Perez alleges that MBIC defended KIPP DC for a substantial period while possessing or developing information concerning the underlying claims and circumstances and subsequently sought declaratory relief asserting grounds for noncoverage. Whether each coverage defense now asserted by MBIC was timely and adequately reserved therefore forms part of the actual coverage controversy before this Court.

622. Perez does not contend that waiver or estoppel may create coverage wholly outside the scope of the applicable insurance contract. Rather, Perez requests determination of whether MBIC's knowledge, conduct, defense of KIPP DC, and reservations of rights preclude MBIC from asserting any particular coverage defense that was not timely and adequately preserved, and whether the requirements of equitable estoppel are otherwise established upon the evidentiary record.

WHEREFORE, Counterclaim Plaintiff Shanique Perez respectfully requests that the Court:

A. Enter declaratory judgment defining the rights and legal relations of Perez, MBIC, and KIPP DC concerning the insurance coverage at issue consistent with the foregoing;

B. Determine the application of relevant policy provisions upon the factual record necessary to apply those provisions;

C. Decline to treat disputed liability facts from the Underlying Litigation as established adversely to Perez merely on the basis of KIPP DC's characterization of those facts;

D. Grant such further relief as is necessary or proper pursuant to 28 U.S.C. § 2202;

E. Award costs and any other relief available to Perez as permitted by law;

F. Grant such other and further relief as the Court deems just and proper; and

G. Declare whether, and to what extent, MBIC waived or is estopped from asserting any particular coverage defense based upon MBIC's knowledge, conduct in undertaking or continuing KIPP DC's defense, the timing and adequacy of its reservation of rights as to that particular defense, and any prejudice required and established under District of Columbia law, without extending coverage beyond that afforded by the applicable insurance contract.

## PRAYER FOR RELIEF

WHEREFORE, Counterclaim Plaintiff Shanique Roseanne Nicole Perez respectfully requests that this Court enter judgment in her favor and against Counterclaim Defendant Massachusetts Bay Insurance Company and Cross-Defendant KIPP DC, as applicable to each claim, and grant the following relief:

A. DECLARATORY RELIEF

1. Enter judgment declaring the rights, obligations, and legal interests of the parties with respect to the insurance coverage placed at issue in this action;

2. Determine the applicability, scope, and effect of the insurance policy or policies potentially implicated by the claims underlying this declaratory judgment action;

3. Determine the parties' respective rights and obligations upon the insurance contracts properly at issue and the evidentiary record necessary to apply the material terms of those contracts;

4. Grant such additional declaratory relief concerning coverage, notice, policy applicability, and the parties' respective legal interests as the Court determines appropriate under 28 U.S.C. §§ 2201 and 2202 and Federal Rule of Civil Procedure 57.

B. RELIEF ON THE COMMON-LAW CLAIMS

5. Enter judgment in favor of Counterclaim Plaintiff on her claim for civil conspiracy upon proof of the underlying tort, agreement, participation, overt acts in furtherance thereof, causation, and resulting injury;

6. Enter judgment on the aiding-and-abetting claim to the extent such secondary liability is recognized and established under applicable District of Columbia law;

7. Enter judgment in favor of Counterclaim Plaintiff and against KIPP DC on the common-law fraud claim alleged in Count I upon proof of its elements;

8. Award compensatory damages in an amount to be determined upon development of the evidentiary record and proof at trial;

9. Award punitive damages to the extent permitted by District of Columbia law and supported by the evidence;

10. Award any other monetary relief available under the causes of action ultimately established.

C. EQUITABLE RELIEF

11. Apply fraudulent concealment as an equitable tolling doctrine to the extent its requirements are established on a claim-specific basis, and apply any other equitable tolling or estoppel principle otherwise properly established by the facts and applicable law;

12. Grant such other equitable relief as may be necessary or proper to give effect to any equitable tolling or estoppel determination established under applicable law.

D. COSTS AND OTHER RELIEF

13. Award Counterclaim Plaintiff her taxable costs to the extent permitted by law;

14. Award pre-judgment and post-judgment interest to the extent authorized by law; and

15. Grant such other and further legal, declaratory, or equitable relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Counterclaim Plaintiff demands trial by jury on all issues so triable as of right under the Seventh Amendment to the United States Constitution and Federal Rule of Civil Procedure 38, while preserving her ability to consent to a nonjury trial of some or all such issues as permitted by Federal Rule of Civil Procedure 39. All remaining issues properly triable to the Court shall be adjudicated by the Court.

Respectfully submitted,

________________________________________

/s/ SHANIQUE ROSEANNE NICOLE PEREZ (She, Her, Hers)
Defendant / Counterclaim Plaintiff / Crossclaim Plaintiff
Pro Se
8/30/2026